# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

RICHARD EDWARDS, JR.,

        Plaintiff,

v.                           CIVIL ACTION NO.   3:16-1879

McELLIOTTS TRUCKING, LLC;
DANNY McGOWAN, individually and as
an employee of McElliotts Trucking, LLC and/or
as agent of Cardinal Transport;
CARDINAL TRANSPORT, INC.;
HAROLD MIDKIFF, individually as agent driver of
McElliotts Trucking, LLC and/or as agent driver of
Cardinal Transport, Inc.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant Cardinal Transport's Motion Summary Judgment, ECF No. 72, and Motion to Strike and Exclude Untimely Evidence, ECF No. 84. For the reasons explained in the following Memorandum Opinion the Court **GRANTS** in part and **DENIES** in part the Motion for Summary Judgment, and **DENIES** the Motion to Strike.

## I.    Background

On October 3, 2015, Plaintiff Richard Edwards was assisting Defendant Danny McGowan, owner of McElliotts Trucking, load large metal rods on to a flatbed trailer at McGowan's truck yard in Kenova, West Virginia. Edwards Dep. 44, Def.'s Mot. for Summ. J. Ex. 7, ECF No. 72-7. McGowan used a forklift and straps to lift the rods on to the bed of the trailer while Edwards attached the straps to the tines of the forklift, guided the rods into place, and placed stops on the

trailer to prevent the rods from rolling off during transport, also known as "scotching." Edwards Dep. 69–72. The rods weighed approximately two-thousand pounds each. McGowan Dep. 91, Pl.'s Resp. to Mot for Summ J. Ex. 4, ECF No. 79. During the course of loading the rods, one fell from the bed of the trailer and struck Edwards' leg. Edwards Dep. 71. Edwards was severely injured and eventually lost the lower part of his leg.

The rod that struck Edwards was part of a shipment of similar materials produced by Special Metals, a Huntington, West Virginia manufacturing firm, and destined for one of its customers. McGowan Dep. 91; Pl.'s Resp. Ex. 7. Special Metals placed the shipment with Defendant Cardinal Transport. Cardinal is an interstate motor carrier that ships freight by semi-truck. Riley Aff. ¶ 2, Def.'s Mot. for Summ. J. Ex. 1, ECF No. 72. Cardinal leased the trucks owned by McElliotts to deliver loads negotiated by McGowan as an exclusive Cardinal sales agent. Exclusive Freight Sales Agency Agreement, Def.'s Mot. for Summ. J. Ex. 3, ECF No. 72-3; Independent Contractor Agreement, Def.'s Mot. for Summ. J. Ex. 4, ECF No. 72-4.

At the time of the accident, McGowan was an exclusive Cardinal sales agent and leased his trucks to Cardinal to deliver shipments for Cardinal customers. *Id.*; McGowan Dep. 47. As both a sales agent and an owner-operator lessor, McGowan solicited customers for Cardinal and arranged for transport using his trucks to deliver shipments. Exclusive Freight Sales Agency Agreement 2; Cardinal Agent's Policy Manual 1–5, Pl.'s Resp. Ex. 13; Independent Contractor Agreement ¶ 1. For his services as an exclusive sales agent with Cardinal, Cardinal paid McGowan an 8.5 percent commission of the first one million dollars in sales per annum and then nine percent on all sales over one million dollars in the same year. Cardinal Agent's Policy Manual 3. McGowan's commission was contingent on placing the shipments on Cardinal-leased trucks, unless Cardinal provided its written permission for McGowan to arrange shipment on another

carrier. Exclusive Freight Sales Agency Agreement 1. Cardinal permitted McGowan to negotiate shipping rates with shippers, but the rate negotiated was subject to approval by Cardinal. Cardinal Agent's Policy Manual 4.

When a shipment was ready for transport McGowan arranged for his trucks, leased by Cardinal, to pick up the shipment and transport it to its destination. McGowan Dep. 66–68. McGowan was paid seventy-six percent of the shipping fee. McGowan Dep. 63. From the commission McGowan was required to pay for a driver, fuel, tolls, and maintenance for the trucks. McGowan Dep. 63–64.

On occasion Special Metals would place a shipment with Cardinal that did not fill an entire trailer. McGowan Dep. 68. In those instances, McGowan would haul the partial load back to his truck yard in Kenova where he would unload it and store it until he collected enough shipments to fill an entire trailer. *Id.* He would then load multiple shipments on one trailer. McGowan Dep. 68, 88, 90 Edwards was injured while McGowan was reloading a trailer. McGowan Dep. 91.

Edwards brought suit for his injuries against McGowan, McElliotts Trucking, Midkiff, and Cardinal Transport. Compl. ¶¶ 2–5. Only Cardinal filed a summary judgment motion and thus the Court will only address the claims against Cardinal. Edwards alleges that as McGowan's ultimate employer, Cardinal is vicariously liable to him for the injuries caused by the accident in McGowan's truck yard. Compl. ¶¶ 60–87. Edwards advances two theories of vicarious liability. The first is based on West Virginia common law and the second on federal regulations that impose certain requirements on Cardinal's relationship with McGowan. *Id.* Edwards also alleges negligent training, hiring, and supervision and negligent entrustment. *Id.*

## II. Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. Analysis

The Court will address Edwards' common law vicarious liability claim and Cardinal's arguments against it, first and address his federal vicarious liability claim, negligent hiring, and negligent entrustment claims in turn.

#### a. *Common Law Vicarious Liability*

It is the burden of the proponent of vicarious liability, in this case Edwards, to make a *prima facie* showing of the existence of a master-servant relationship. *Zirkle v. Winkler*, 585 S.E.2d 19, 22 (W. Va. 2003) (quoting *Sanders v. Georgia-Pacific Corp.*, 225 S.E.2d 218, 222 (W. Va.

1976)). Once that showing has been made "it is incumbent upon one who would defeat liability on the basis of an independent contractor relationship to show such fact." *Id.*

Four features of a relationship must be present to sustain a claim of vicarious liability in West Virginia common law. They are: "(1) Selection and engagement of the servant; (2) Payment of compensation; (3) Power of dismissal; and (4) Power of control." *Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n*, 737 S.E.2d 270, 277 (W. Va. 2012) (quoting *Paxton v. Crabtree*, 400 S.E.2d 245, Syl. pt. 5 (W. Va. 1990)). The determinative feature, the West Virginia Supreme Court of Appeals held, is the power of control. *Id.*

On the power of control, the West Virginia Supreme Court expounded "the entity engaging an independent contractor is not required to surrender all control in order to maintain an independent contractor relationship." The Court described the power to control the outcome of the contract as insufficient to create an employer-employee relationship. Instead, it is the power over the process, not just the outcome, that demonstrates the essential feature of control such that a master-servant relationship exists. *Roberston v. Morris*, 546 S.E.2d 770, 773 (W. Va. 2001).

Cardinal admits that the first three elements are present in its relationship with McGowan, but it contests the fourth element—the power of control. It argues that it did not have the kind of control over McGowan to create a master-servant relationship exposing it to vicarious liability for his allegedly negligent acts. It further argues that Edwards has not presented any evidence contrary to its argument and therefore cannot survive summary judgment.

At the summary judgment phase, the plaintiff is not required to prove the case; the plaintiff must only present more than a "scintilla" of evidence supporting the claim such that a reasonable juror could find in the plaintiff's favor. In a claim for vicarious liability of an employer, a plaintiff meets this burden "[w]here the evidence relative to whether a particular person in an independent

contractor or an employee is in conflict or, if not in conflict, admits of more than one reasonable inference . . . ." *Zirkle*, 585 S.E.2d 19, Syl. pt. 3 (quoting *Levine v. Peoples Broad. Corp.*, 140 S.E.2d 438 (W. Va. 1965)). The evidence before the Court is conflicting and subject to more than one reasonable inference. Accordingly, the classification of the relationship between McGowan and Cardinal is committed to the jury.

Two contracts govern McGowan's relationship with Cardinal. The first is the "Exclusive Freight Sales Agency Agreement" and the second is titled "Independent Contractor Agreement." The substance of the first governs McGowan's rights and duties as a sales agent. The second governs Cardinal's lease of McGowan's trucks to deliver the shipments arranged by McGowan under the sales agent agreement. A review of the sales agent agreement reveals Cardinal exerted significant control over McGowan's operation. Although the contract itself is quite short, the contract incorporates the "Cardinal Agent's Policy Manual"—a tome-like document that touches on every aspect of an agent's business. *See* Cardinal Agent's Policy Manual 1–97. The Manual requires, among other things, every customer to go through a credit check and meet standards set by Cardinal, and that all shipping rates negotiated by the sales agent be reviewed by Cardinal. *Id.* 1, 4–5. These two requirements give Cardinal, at the very least, veto power over the primary functions of the sales agent—soliciting customers and negotiating shipping rates. The Manual goes on, however. Shipping contracts are only completed once Cardinal provides a finalized contract to the agent. *Id.* 5. Billing is also largely handled by Cardinal. *Id.* 14. Cardinal issues invoices to shippers for each load moved, sends a report to agents twice a month informing them of outstanding invoices, and sends statements to each customer with an open invoice. *Id.*

The sales agent agreement further supports an inference of control. Most notably, the contract contains a non-compete clause, barring the sales agent from working with a customer or

competitor of Cardinal as a sales agent for one year. Exclusive Freight Sales Agency Agreement 3. The contract also states that any money collected by the sales agent is the sole property of Cardinal until Cardinal remits to the sales agent his or her commission. *Id.* 1–2. The agreement bars the sales agent from shipping any freight on any carrier except Cardinal unless he or she receives Cardinal's express written permission. *Id.* 1. It also bears repeating that McGowan was an exclusive sales agent, meaning he worked solely for Cardinal. *Id.*

The Independent Contractor Agreement, despite its name, further supports an inference of Cardinal's meaningful control over the process of shipping loads placed with McGowan. The lessor, in this case McGowan, could only hire drivers that complied with certain qualifications, including a particular driver ranking on "CSA2010." *Id.* ¶ 5(b)(viii). McGowan was further required to purchase and maintain at least $500,000 of public liability and property damage insurance as well as an insurance policy covering collision, fire, theft, or other catastrophes. *Id.* ¶ 6(e). McGowan was also required to file with Cardinal all log sheets, physical examination certificates, and accident reports and keep a copy of the contract in the truck at all times. Independent Contractor Agreement ¶ 5(a)(ii)–(iii). McGowan testified in his deposition that his drivers were required to contact Cardinal dispatch daily to inform Cardinal of their progress. McGowan Dep. 68.   All of McGowan's trucking business was through Cardinal. McGowan Dep. 61.

Taken together, McGowan's business with Cardinal stretched from soliciting customers and negotiating shipping rates to leasing his trucks to Cardinal and finding drivers to deliver the shipment to its destination. At each of these stages, however, Cardinal had the power to exercise meaningful control over McGowan's business. Cardinal had the power to review potential customers and the rates negotiated with McGowan. Cardinal provided McGowan with forms and

advice on how best to conduct his sales agent business, collected shipping fees, paid McGowan his commission, and reminded customers of their outstanding balances. Cardinal further required all drivers to meet certain qualifications, checked up on them daily, imposed insurance requirements on McGowan, and set reporting requirements on a range of information.

While both McGowan and Cardinal's owner testified that they understood their relationship to be that of an independent contractor, their characterization of the relationship is not determinative. *Zirkle*, 585 S.E.2d 23. Neither are the labels used for the parties in their agreements. *Id.* The provisions of the agreements and other testimony from McGowan support a reasonable inference that McGowan was an employee of Cardinal and thus Cardinal could be subject to vicarious liability for the negligent acts of McGowan.[1]

     b. *Scope of Employment*

Even if McGowan is ultimately found to be an employee of Cardinal, Cardinal is only liable for McGowan's negligent acts done in the scope of his employment. West Virginia common law defines the scope of employment with three elements: (1) the conduct is of the kind he or she is employed to perform; (2) the conduct occurs within the authorized space and limits; and (3) it is actuated, at least in part, by a purpose to serve the master. *W. Va. Reg'l Jail and Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 770 (W. Va. 2014). Again, the West Virginia Supreme Court

---

[1] The Independent Contractor Agreement also incorporates a "control" provision mandated by federal regulations promulgated by the Federal Motor Carrier Safety Administration. Independent Contractor Agreement ¶ 6(a); 49 C.F.R. § 376.12(c)(1). The regulations require all leases to include a provision that rests control and operation of all of the leased equipment in the hands of the carrier. 49 C.F.R. § 376.12(c)(1). The parties contest the effect of the regulation on their relationship. The Court addresses this dispute directly in a later section, but at this moment, and related to Edwards' common law claim, as opposed to his federal claim, which is the claim wherein the Court fully addresses the meaning of the federal regulations, its inclusion in the lease serves to bolsters the Court's conclusion that Cardinal is not entitled to summary judgment on Edwards' vicarious liability claim.

explained "[o]rdinarily, the determination whether an employee has acted within the scope of employment presents a question of fact." *Id.* Where there is conflicting evidence or where the evidence is in accord but is subject to conflicting inferences, the determination is for the jury. *Id.* Here again the evidence presented to the Court is either in conflict or susceptible to contrary but reasonable inferences. Thus, the jury must decide whether McGowan was acting within the scope of his employment when Edwards was injured.

Cardinal commits much of its argument to highlighting that it never expressly authorized McGowan to load or unload anything, thus, rendering his loading practices outside the kind of conduct for which Cardinal employed McGowan. Whether McGowan was expressly permitted or required to do any loading is not determinative of whether he was acting within the scope of his employment. On this issue the West Virginia Supreme Court held "[w]here a master sends forth an agent he is responsible for the acts of his agent within the apparent scope of his authority, though the agent oversteps the strict line of his duty." *Nees v. Julian Goldman Stores, Inc.*, 146 S.E. 61, 62 (W. Va. 1928). An employee may be acting within the scope of employment even if the act is unauthorized when the act "can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of that act or a natural, direct or logical result of it." *Levine v. Peoples Broadcasting Corp.*, 140 S.E.2d 438, 442 (W. Va. 1965); *see also Travis v. Alcon Labs. Inc.*, 504 S.E.2d 419, 431 (W. Va. 1998) ("[A]n employer may be liable for the conduct of an employee, even if the specific conduct is unauthorized or contrary to express orders, so long as the employee is acting within his general authority and for the benefit of the employer."). Whether the act is a natural incident to one's employment is a "relative term" that "requires a consideration of surrounding circumstances . . . ordinarily determined by the jury." *Griffith v. George Transfer & Rigging, Inc.*, 201 S.E.2d 281, 288 (W. Va. 1973).

It is not a far stretch to deem loading a truck a natural incident to shipping freight by truck. Indeed, it is fair to say that it is necessary. The fact that McGowan was not loading shipments at their destination does not, as a matter of law, transform the act into "something different in kind from that authorized." *A.B.*, 766 S.E.2d at 770. From the evidence presented to the Court, partial loads are often dispatched by Special Metals to McGowan's trucks. It is reasonably expected that McGowan would then attempt some form of consolidation to make his operation more efficient. *See* Riley Dep. 48–49, Pl.'s Resp. Ex. 1, ECF No. 79 ("You know, the idea is to put as much money, legally, on your truck as possible."). Accordingly, a reasonable inference can be drawn that loading and unloading to consolidate partial loads onto a single truck were natural incidents to McGowan's employment. It is for the jury, not this Court, to make the ultimate determination whether McGowan's loading practices were in fact a natural incident to his employment.

Cardinal also argues that McGowan was not actuated by a purpose to serve Cardinal because any efficiencies realized by McGowan accrued solely to McGowan. For each truckload he transported McGowan was paid seventy-six percent of the total shipping fee. Out of that fixed commission McGowan had to pay tolls, fuel, and his drivers; the remainder was his profit. Thus, Cardinal argues, any savings by consolidating loads would accrue only to McGowan in the form of lower labor, toll, and fuel costs by using one truck instead of multiple trucks. The Court agrees with Cardinal's description, but it is only a partial account of the division of benefits realized by McGowan and Cardinal.

McGowan need not be actuated solely by a desire to serve Cardinal. *A.B.*, 766 S.E.2d at 770 (finding the act must be "actuated, *at least in part*, by a purpose to serve the master." (emphasis added)). It is reasonable to infer that where McGowan was able to create efficiencies in his trucking operation he could use those savings to present more competitive shipping rates to Special Metals

thereby ensuring continued use of Cardinal as its carrier. The actuating purpose of McGowan's consolidation method was undeniably self-serving, but a reasonable inference can be drawn that it was also partially actuated by a desire to serve Cardinal by keeping a lucrative customer. Accordingly, the jury is the proper body to determine this issue.

### c. Federal "Statutory Employee" Liability[2]

Cardinal's next line of argument attacks Edwards' "Logo/Lease Liability" claim.[3] As an initial matter the Court would like to note that this claim, as the Court construes it, is not an independent claim apart from Edwards' common law vicarious liability claim. As will be made clear in the following explanation, the "statutory employee" claim assumes an additive role in the common law analysis, bolstering Edwards' allegations that McGowan was a Cardinal employee but not subsuming the traditional common law standard defining a master-servant relationship as some courts have held.

The statutory employee claim is based on a constellation of federal statutory provisions and federal regulations that have in the past been interpreted to impose a form of employer-employee relationship between carriers like Cardinal and the owner-operators of the trucks leased by those carriers. *See, e.g.*, *Price v. Westmoreland*, 727 F.2d 494, 495 (5th Cir. 1984); *Rodriguez v. Ager*, 705 F.2d 1229, 1237 (10th Cir. 1983). The regulations on which the claim is based,

---

[2] Both parties agree that the West Virginia Supreme Court of Appeals decision *Griffith v. George Transfer & Rigging, Inc.*, 201 S.E.2d 281 (W. Va. 1973), is the leading opinion on this claim. The Court cannot agree. The *Griffith* case, a decision from West Virginia's highest court, has no bearing on the interpretation of federal statutes or regulations. Moreover, even if it carries some persuasive authority, the *Griffith* decision precedes a change in the federal regulations at issue in this case by two decades, and therefore has little impact on the Court's view of them in their amended form. The *Griffith* decision is, on the other hand, useful and precedential as it applies to West Virginia common law vicarious liability. It is in this capacity that the Court cited the case in the previous section.

[3] This type of claim has also been called "statutory employee" liability. *Delaney v. Rapid Response, Inc.*, 81 F. Supp. 3d 769, 775 (D.S.D. 2015).

however, were subject to amendment in 1992. *Delany, Inc.*, 81 F. Supp. 3d at 775. "[T]he continued vitality of the logo liability doctrine [thus] remains unclear, and courts have struggled with apportioning liability" following the 1992 amendments. *Occidental Fire & Cas. Co. of N.C. v. Soczynski*, No. 11-cv-2412, 2013 WL 101877, at *8 (D. Minn. Jan. 8 2013).

The leading interpretation of the amended regulations, however, ultimately reduces to a reliance on state common law to classify a carrier's relationship with the lessor. In light of the dispositive influence of state common law on the ultimate determination, Edwards "Logo/Lease Liability" claim is functionally moot, given the Court's earlier determination that summary judgment is improper for Edwards' common law vicarious liability claim. Its only application to this case is to strengthen Edwards' common law vicarious liability claim, which the Court has already concluded may continue even without resort to the federal regulations. Nevertheless, the Court will take up the issue to explain its position.

In 1956 Congress amended the Interstate Common Carrier Act "in order to protect the public from the tortious conduct of the often judgment-proof truck lessor operators by requiring interstate motor carriers to assume full direction and control of the vehicles 'as if they were the owners of such vehicles.'" *Bays v. Summit Trucking, LLC*, 691 F. Supp. 2d 725, 731 (W.D. Ky. 2010) (quoting *Price*, 727 F.2d at 495–96) (internal ellipses and brackets omitted). Congress' purpose is codified in the language of 49 U.S.C. § 14102(a)(4) which states:

> (a) General authority of Secretary.—the Secretary may require a motor carrier providing transportation . . . that uses motor vehicles not owned by it to transport property under an arrangement with another party to—
>
> . . .
>
>> (4) have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier.

As a result of Section 14102, the Interstate Commerce Commission[4] ("ICC") promulgated 49 C.F.R. § 376.12(c)(1) ("control regulation") which states:

(c) Exclusive possession and responsibilities.

> (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

Prior to 1992 the majority view of Section 376.12(c)(1) interpreted the regulation to create an irrebuttable "statutory employment" between carriers and owner-operator lessors that was independent from any state common law definition. *See, e.g.*, *Price*, 727 F.2d at 495; *Rodriguez*, 705 F.2d at 1237. Some courts went so far as to impose strict vicarious liability on carriers for any damage caused by owner-operator lessors while operating a leased vehicle. *Id.*; *see also Wellman v. Liberty Mut. Ins. Co.*, 496 F.2d 131, 136 (8th Cir. 1974).

Beginning in the late 1980's, however, and at the behest of petitions by industry trade groups, the ICC began issuing guidance documents that seriously questioned the prevailing judicial interpretation of its regulations. *See* Lease & Interchange of Vehicles (Identification Devices) (49 C.F.R. Part 1057), 3 I.C.C.2d 92, 93 (1986). "The [ICC] emphasized that the nature of vicarious liability under a regulated lease is a matter of *state*, not federal, law . . . ." *Lohr v. Zehner*, No. 2:12-cv-533, 2014 WL 2504574, at *3 (M.D. Ala. Jun. 3, 2014). The ICC opined that it:

---

[4] Congress dissolved the Interstate Commerce Commission when it passed the Interstate Commerce Commission Termination Act of 1995 and replaced it with, among other agencies, the Federal Motor Carrier Safety Administration ("FMCSA"). *See* Pub. L. No. 104-88, 109 Sta. 803 (codified at 49 U.S.C. §§ 13101–14901). All amendments and guidance that bear on the issue before the Court were issued or enacted before the duties of the ICC were transferred to the FMCSA. As such, the Court will refer to the ICC in its discussion even though the FMCSA currently administers the regulations at issue here.

> Prefer[s] that courts decide suits of this nature by applying the ordinary principles of State tort, contract, and agency law. The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort . . . law and create carrier liability where none would otherwise exist. Our regulations should have no bearing on this subject. Application of State law will produce appropriate results.

Lease & Interchange of Vehicles, 3 I.C.C.2d at 93. The recalibration of the leasing regulations culminated in 1992 when the ICC formally amended Section 376.12(c) by adding Subsection (4). Section 376.12(c)(4) clarifies:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements.

Despite the amendment's apparent clarity, there is no consensus among federal courts of the amendment's effect on the relationship between carriers and owner-operator lessors. Three approaches have surfaced in the intervening years. A small number of courts to have come in contact with these regulations cling to the pre-1992 interpretation of the control regulation. *See, e.g.*, *Zamalloa v. Hart*, 31 F.3d 911, 917 (9th Cir. 1994). A second group has emerged that holds that Subsection (c)(4) requires that courts interpret the control regulation to have no bearing on the classification of the relationship between carriers and owner-operators. *See, e.g.*, *Lohr v. Zehner*, No. 2:12-cv-533, 2014 WL 2504574, at *2–*3 (M.D. Ala. Jun. 3, 2014); *Jett v. Van Eerden Trucking Co., Inc.*, No. 10-cv-1073, 2012 WL 37504, at *4 (W.D. Okla. Jan. 9, 2012). Finally, a third group of courts believe the control regulation and Subsection (c)(4) create a rebuttable presumption of employment that can be rebutted by resort to state common law principles. *See Delaney*, 81 F. Supp. 3d at 779; *Thomas v. Johnson Agri-Trucking*, 802 F. Supp. 2d 1242, 1249 (D. Kan. 2011); *Bays*, 691 F. Supp. 2d at 730–31. The final interpretation is the most reasonable. It respects both the ICC's desire to base the ultimate classification of the carrier-owner-operator

relationship on state common law and Congress' intent to "thwart[] abuses by carriers who would lease equipment from independent contractors who [are] not . . . regulated." *Bays*, 691 F. Supp. 2d at 731.

The "rebuttable presumption" standard avoids the fundamental problem with each of the other two interpretations—disregard of either Subsection (c)(1) or (c)(4). Courts that have continued to hold that the control regulation creates an irrebuttable employment relationship read Subsection (c)(4) out of the ICC regulations and ignore the ICC's plainly stated intent in its guidance documents. This is problematic for one particularly obvious reason: for the time being,[5] an agency's interpretation of its own regulation is due deference unless the "interpretation of it is . . . plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). Deference of this kind is known alternately as *Auer* Deference or *Seminole Rock* Deference. *See Bowles v. Seminole Rock & Sand Co*, 325 U.S. 410, 414 (1945). The latter case serves as the genesis of this sort of agency deference, while the former unanimously reaffirmed *Seminole Rock*. *See Auer*, 519 U.S. at 453, 461. There is certainly some tension between the control regulation and Subsection (c)(4) and ICC guidance. Nevertheless, Subsection (c)(4) and the related guidance are not "plainly erroneous or inconsistent with" Subsection (c)(1). Thus, it is due deference, and cannot be ignored.

Courts that have held that the control regulation, and thereby Section 14102, has no impact on the relationship between carriers and owner-operators wish away Subsection (c)(1). Subsection

---

[5] Recently, a number of commentators and judges, not least among them, Justice Scalia, who incidentally wrote the *Auer* decision, have questioned its place in administrative law. *See Decker v. N.W. Envtl. Def. Ctr.*, 568 U.S. 597, 616 (2013) (Scalia, J., concurring in part & dissenting in part). *Auer* may not be long for American law. Conor Clarke, *The Uneasy Case Against* Auer *and* Seminole Rock, 33 Yale L. & Pol'y R. 175, 176 (2014).

(c)(1), however, quite clearly carries out the Congressional mandate found in Section 14102 that compelled the ICC to promulgate leasing regulations requiring carriers to exert control over leased trucks "as if the motor vehicles were owned by the motor carrier." 49 U.S.C. § 14102. Even a resort to *Auer* Deference cannot delete a properly promulgated regulation. Moreover, without some bearing on the relationship between carriers and owner-operators, the use and purpose of the control regulation are indiscernible. The Court is confident that neither Congress nor the ICC intended for the control regulation to be reduced to a *pro forma* clause in a lease with no application other than a mechanical repetition of the regulation in leasing contracts.

Further, the rebuttable presumption standard presents a tidy symmetry with West Virginia common law. West Virginia law requires the proponent of vicarious liability to demonstrate a *prima facie* showing of an agency relationship. The burden then shifts to the party invoking the independent contractor defense to avoid liability. Application of the rebuttable presumption standard substitutes for the initial *prima facie* showing. The ultimate classification of the relationship is still determined by resort to West Virginia common law when a carrier invokes the independent contractor defense. Seen to its application in this case, the rebuttable presumption standard achieves the balance between reliance on state common law and protection of the public from the transfer of liability from regulated carriers to judgment-proof lessors that is evident in both statute and regulations.

In light of the Court's earlier finding that Edwards' vicarious liability claim may proceed, the application of a rebuttable presumption doctrine based on federal law as an avenue to establish vicarious liability is moot for the purposes of this Memorandum Opinion. Notwithstanding, however, the standard may become applicable should this case proceed to trial.

d.   *Negligent, Hiring, Retention, and Training*

Count Ten of Edward's Complaint alleges common law negligent, hiring, retention, and training against Cardinal. Compl. ¶¶ 72–80, ECF No. 1.

In *McCormick v. W. Va. Dept' of Pub. Safety*, the West Virginia Supreme Court of Appeals explained that a claim of negligent hiring or retention involves the following inquiry:

> When the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?

503 S.E.2d 502, 506 (W. Va. 1998) (per curiam). The *McCormick* Court further explained that the inquiry depends upon "the nature of the employee's job assignment, duties, and responsibilities." *Id.* at 507. "The duty with respect to hiring and retention increases 'as the risks to third persons associated with a particular job increase.'" *Woods v. Town of Danville*, 712 F. Supp. 2d 502, 514 (S.D. W. Va. 2010) (quoting *id.*).

Edwards' negligence claim alleges that Cardinal failed to evaluate and monitor McGowan's practices and should have known that both McGowan and Midkiff would act in a negligent or reckless manner when loading and unloading trucks. Cardinal maintains that it is entitled to summary judgment on this claim because McGowan was never contracted to load or unload trucks. This argument is unavailing at this juncture given the Court's earlier determination that the scope of McGowan's employment is an issue for the jury.

Cardinal next contends that even if McGowan and Midkiff are employees, Cardinal conducted the "industry standard, legally required[,] and reasonable investigation into" their backgrounds and Edwards has presented no evidence that Cardinal failed in this duty. The Court agrees. Edwards has presented no evidence that would support a claim that Cardinal failed to

investigate properly either McGowan or Midkiff when it hired McGowan to deliver freight. Accordingly, Edwards' negligent hiring claim cannot survive.

Edward's negligent retention claim, on the other hand, may proceed. Cardinal argues that it had no notice that McGowan was doing any loading in his truck yard and therefore had no reason to investigate McGowan's shipping practices. Here again, the evidence is in conflict. The deposition testimony of John Riley, Cardinal's owner, illustrates the conflict. He testified that "there should not ever, ever be an owner-operator [loading or unloading trucks]." Riley Dep. 79. Strangely, given such an unequivocal position, the lease agreement does not contain any provision prohibiting loading and unloading trucks. Further, Riley also testified that a lessor "wouldn't require prior approval" to consolidate loads by loading partial loads onto one truck. Riley Dep. 64. When asked if he knew of McGowan's practice, Riley first replied: "[n]ot really." Riley Dep. 42 When pressed further he clarified that he did not "recall if anyone's brought that to my attention." Riley Dep. 42. Riley's testimony is inconsistent on whether lessors are permitted to load or unload trucks, and whether he knew about McGowan's loading practices.

On this latter point, Riley's testimony is in conflict with McGowan's testimony. McGowan testified that Riley visited his truck yard at least once. McGowan Dep. 67–68. McGowan also testified that Cardinal knew that some loads were offloaded in his truck yard.[6] McGowan Dep. 68.

Cardinal's computerized dispatching system also provides some evidence that Cardinal was aware of McGowan's loading practices. The system tracks each load dispensed by Special

---

[6]     A: Not every load gets offloaded, No.
         Q: Okay. Sometimes they do?
         A: Yes.
         Q: And Cardinal knows that; right?
         A: Yes.
McGowan Dep. 68.

Metals and also the load's eventual departure from the Huntington area and its arrival at its destination. A printout of the information displayed by the dispatch system shows that loads dispensed by Special Metals on different days were delivered by the same truck. Pl.'s Ex. 6. Riley explained in his deposition that this information is not enough for Cardinal to know that McGowan was loading trucks in his yard. Riley Dep. 48. It could indicate, Riley supposed, that McGowan sent the same truck that was previously loaded with a partial load back to Special Metals to pick-up a subsequent partial load. Riley Dep. 48–49. "You know the idea is to put as much money, legally, on your truck as possible," Riley explained. Riley Dep. 48–49. It is also equally possible, based on the information presented to the Court, that McGowan consolidated the loads in his yard by offloading and then reloading certain shipments. Riley's testimony does not foreclose this possibility.

Cardinal had all the pieces it needed to, at the very least, prompt an investigation of McGowan's shipping practices. Its dispatch system revealed that different shipments dispatched on different days were being delivered by a single truck. Its management understood the incentive for owner-operator lessors to load as much on their trucks as legally permitted, and possibly encouraged this. Thus, naturally leading to consolidation of shipments. Cardinal's owner visited McGowan's yard where partial loads were likely to be visible. And finally, McGowan testified that Cardinal knew about his loading practices.

Although Cardinal appears to have an unwritten policy prohibiting owner-operators from loading trucks, Riley explained that an owner-operator could load trucks without any sort of approval, leaving one to wonder what Cardinal's policy is and how, if any policy existed, it monitored compliance. The ultimate question, however, is whether Cardinal's claimed ignorance, despite some indication of McGowan's practices, and subsequent failure to recognize those

practices, was reasonable. The Court cannot answer that question on summary judgment. Reasonable minds could differ on whether to infer that Cardinal had sufficient information to prompt an investigation of a manifestly dangerous practice—loading and unloading large metal objects onto and off of truck trailers—and that a failure to conduct such an investigation was unreasonable given the amount of information known to Cardinal and the danger of the practice posed to third parties and employees. The ultimate determination of this issue is therefore committed to the jury. *Burgess v. Jefferson*, 245 S.E.2d 626, 628 (W. Va. 1978) (citing *Cook v. Harris*, 225 S.E.2d 676 (W. Va. 1976) ("Negligence . . . is a jury question when the evidence is conflicting or the facts are such that reasonable men [and women] may draw different conclusions from them.").

Cardinal goes on to argue that Edwards' injury could not have been foreseen by Cardinal because McGowan acted outside any duty he was contracted to perform and had no knowledge of McGowan's loading practices. Cardinal's argument is again unavailing at this juncture. The Court has already determined that the scope of McGowan's employment is a question for the jury. Further, whether Cardinal knew or should have known about McGowan's loading practices is, as explained in the previous paragraph, an issue committed to the jury for resolution.

e. *Negligent Entrustment*

Count Nine of the Complaint alleges that Cardinal negligently entrusted the semi-truck to McGowan and Midkiff because Cardinal had reason to know that they were likely to use the truck in a negligent or reckless manner. Cardinal counters that the trailer onto which McGowan was loading the metal rods was owned by CTI Trailer Sales, LLC and subject to a lease-to-own agreement between McElliotts and CTI. Cardinal further argues that McGowan owned the semi-truck that was hitched to the trailer. Cardinal therefore maintains that because it did not own any

of the equipment related to the accident, it did not entrust anything to any of its co-Defendants. Strictly, it is true that Cardinal did not entrust the truck or trailer to its co-Defendants. Legally, however, Cardinal did just that.

> The Supreme Court of Appeals has defined the claim of negligent entrustment as:
>
> An owner who entrusts his motor vehicle to a person whom he knows, or from the circumstances is charged with knowing, to be incompetent or unfit to drive it is liable for injury inflicted which results from the use of the automobile by the driver if the injury was proximately caused by the disqualification, incompetency, inexperience, intoxication or recklessness of the driver.

*Clark v. Shores*, 499 S.E.2d 858, 860 (W. Va. 1997) (quoting *Payne v. Kinder*, 127 S.E.2d 726, Syl. Pt. 11 (W. Va. 1962)). The lease agreement between McGowan and Cardinal specifically states that "The Equipment shall be for [Cardinal's] exclusive possession, control, and use for the duration of this agreement." Independent Contractor Agreement ¶ 6(a). It further states that "[Cardinal] shall assume complete responsibility for the operation of the Equipment for the duration of this agreement." *Id.* While McGowan owned or was leasing the truck and trailer involved in the accident, Cardinal assumed full control over that equipment as the leasee and permitted McElliotts, McGowan, and Midkiff to operate it on its behalf. The Court is aware that Cardinal attempts to disclaim this responsibility by including a clause that states that the control clause was only included to comply with the federal control regulation and "shall not be used for any other purposes . . . ." *Id.*

Cardinal cannot disclaim a federal directive through contract with McGowan and McElliotts. 49 C.F.R. § 376.12(c)(1) requires that all leases between carriers like Cardinal and owner-operators like McElliotts and McGowan include a provision that the carrier assume "exclusive possession, control, and use of the equipment." To the extent that the lease conflicts with federal law, it stands against public policy and cannot be enforced. *W.R. Grace & Co. v. Local*

*Union 759, Int'l Union of United Rubber Cork, Linoleum & Plastic Workers of Am*, 461 U.S. 757, 765 (1983) ("As with any contract . . . a court may not enforce . . . [an] . . . agreement that is contrary to public policy."). Thus, Cardinal did in fact entrust the operation of the truck and trailer it leased from McElliotts and McGowan to its co-Defendants, regardless of the fact that McGowan has title to the semi-truck and was leasing the trailer. Accordingly, Cardinal is not entitled to summary judgment on Edwards' negligent entrustment claim.

      f.   *Joint Venture*

In his Response Edwards faults Cardinal for not addressing his claim of Joint Venture. As an initial matter, the Court is skeptical that Edwards ever actually alleged a joint venture claim in his Complaint. After a review of the Complaint, the Court notes that, while all of Edwards other claims were specifically addressed in individually number counts, his joint venture claim was not. For some reason, Edwards expects Cardinal, and now this Court, to intuit from a few scattered references in his Complaint that he was, in fact, alleging a separate claim of joint venture to support a claim of vicarious liability against Cardinal. *See* Compl. ¶ 14 ("Defendant McElliotts and Defendant Cardinal operate a commercial truck to further a shared business operation/joint venture, much of which is carried out in Kenova, West Virginia.").

Nevertheless, Cardinal has not objected on these grounds, instead opting to pursue a line of argument going to the merits of Edwards claim. Cardinal insists that Edwards has presented no evidence that McElliotts and Cardinal ever shared profits or losses or that McElliotts had any control over Cardinal's business. The Court agrees.

The Supreme Court of Appeals defines a joint venture as: "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine property, money, effects, skill, and knowledge. It arises out of a contractual relationship between

the parties." *Cunningham*, 737 S.E.2d at Syl. Pt. 10. The hallmarks of a joint venture that set it apart from other forms of business relationships are profit sharing between the parties and the equal legal right to manage or control the business. *Armor v. Lantz*, 535 S.E2d 737, 743, 745 (W. Va. 2000).

Edwards has not presented to the Court any evidence that there was any express or implied agreement for sharing profits, nor do any of the agreements at issue in this case permit McElliotts equal legal control over aspects of the business. Receiving benefits from one another is not enough to permit a reasonable juror to find that Cardinal and McElliotts were joint venturers—nearly every bargained for exchange would become a potential joint venture, if that were the case. Accordingly, Edwards' joint venture claim cannot survive.

## IV. Cardinal's Motion to Strike and Exclude

In addition to its summary judgment motion, Cardinal filed a motion to exclude Edwards' Second Supplemental Rule 26(a)(1) Initial Disclosures and to strike all or part of Edwards' Response to Cardinal's summary judgment motion because the Response exceeded the page limit found in the Court's local rules. The Court is not inclined to grant either request.

Edwards' supplemental disclosures were admittedly made after the close of discovery. Federal Rule of Civil Procedure 37 provides remedies for a party's failure to provide the required supplements to discovery responses and states the following in pertinent part:

> If a party fails to provide information . . . as required by Rule 26 . . . (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). This Court has previously held that "Rule 37(c)(1) . . . generally requires exclusion of evidence that a party seeks to offer but has failed to disclose." *EQT Gathering, LLC v. Marker*, No. 2:13-cv-08059, 2015 WL 9165960, at *8 (S.D. W. Va. Dec. 16, 2015) (quoting *S.*

*States Rock & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). Rule 37, however, does permit untimely disclosures in two cases—"the failure was substantially justified or is harmless." Here, the failure was harmless.

The Fourth Circuit created a five-part analysis to help guide courts on whether an untimely disclosure is harmless or substantially justified. The five factors are:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States*, 318 F.3d at 597.

Edwards' untimely disclosure addresses evidence related to whether Cardinal knew about McGowan's loading practices. Cardinal contends that this has been an issue in the litigation since its inception and therefore Edwards knew that he would need evidence supporting his claim that Cardinal knew about the loading practices. In the main, Cardinal is correct. The importance of the issue for at least some of Edwards' claims is patently obvious, and Edwards should have known that he needed to collect evidence supporting his claims from the moment he filed this case.

Notwithstanding, given the primacy of the issue for some of Edwards' claims and Cardinal's defense, Cardinal could not have been surprised in any great degree by the disclosure of a witness that claims that Cardinal knew about McGowan's loading practices. Moreover, even if Cardinal was surprised, the surprise can be easily cured through agreement with Edwards to reopen discovery for the limited purpose of deposing the witness. At this stage in the case, it would have no effect on the trial. The Court recently continued trial until the middle of October. Finally, the Court did not find it necessary to resort to any of the challenged evidence in its decision to deny Cardinal's Motion for Summary Judgment. While the Court is skeptical of Edwards' explanation for his failure to disclose, the Court is confident that Edwards did not intend to surprise

Cardinal. Very likely Edwards' failure represents a bungled oversight rather than a malicious attempt to manipulate the trial process.

Now that trial has been continued, the Court encourages the parties to resolve the matter between themselves, if possible. If it is not possible, the Court would entertain a motion requesting a limited reopening of discovery to depose the newly disclosed witness.

The Court further declines to strike any part of Edwards' Response. It is true that the Local Rules prohibit filings over twenty pages without leave of the Court and Edwards' Response was *twenty-seven* pages. Notwithstanding, the Court is not in the habit of denying a party its opportunity to present arguments on the merits of the case on what amounts to a technicality. The Fourth Circuit, and this Court, strongly favor the resolution of cases on the merits, not on technical procedural grounds. *Foster v. Tannenbaum*, No. 3:16-cv-4101, 2016 WL 7379025, at *2 (S.D. W. Va. Dec. 20, 2016); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993).

## V.     Conclusion

For the foregoing reasons Defendant's Motion for Summary Judgment, ECF No. 72, is **GRANTED** in part and **DENIED** in part. Defendant's Motion to Strike is **DENIED**. ECF No. 84.

The Court **DIRECTS** the Clerk to send a copy of this Order and Notice to counsel of record and any unrepresented parties.

ENTER:      August 2, 2017

ROBERT C. CHAMBERS, CHIEF JUDGE