IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

RICHARD EDWARDS, JR.,

        Plaintiff,

v.                                                           CIVIL ACTION NO. 3:16-1879

McELLIOTTS TRUCKING, LLC;
DANNY McGOWAN, individually and as
an employee of McElliotts Trucking, LLC and/or
as agent of Cardinal Transport;
CARDINAL TRANSPORT, INC.;
HAROLD MIDKIFF, individually as agent driver of
McElliotts Trucking, LLC and/or as agent driver of
Cardinal Transport, Inc.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Cardinal Transport LLC's Motion *in Limine* to Exclude Expert Testimony and Life Care Plan of Lisa Westfall. ECF No. 100. For the following reasons the Court **DENIES** the Motion.

**I.    Background**

Plaintiff Richard Edwards was injured while assisting in loading large metal rods onto the trailer of a semi-truck. One of the rods, weighing almost 2,000 pounds, fell from the truck and struck Edwards in the leg. Edwards' leg was severely injured and the lower part of it was amputated.

In support of his claim for damages, Edwards engaged the services of life care planner Lisa Westfall as an expert witness. Westfall reviewed reports created by a Dr. Richard Vaglienti and

Nick Wheeler and compiled a life care plan that explains the future medical care needed by Edwards for his injury. Dr. Vaglienti's report contains a list of recommendations of medical devices and services he will need as a result of his injury. Wheeler's expert report recommended certain prosthetics, orthopedic equipment, and physical therapies that Edwards will need as a result of the loss of the lower portion of one of his legs. Westfall relied on these reports to create a life care plan that attempts to quantify and explain the cost of the medical services, prosthetics, physical therapy, and orthopedic care that Edwards will need over the course of his life.

Cardinal contends that Westfall is not qualified to give expert opinion and her life care plan is not admissible pursuant to Federal Rule of Evidence 702. Cardinal argues that Westfall is not a medical doctor and therefore is not qualified to testify to medical care, treatment, and therapies. Cardinal further insists that Westfall's opinions in her life care plan were based on recommendations of Dr. Vaglienti and Wheeler, which were rendered with a degree of certainly below "a reasonable degree of medical certainty," and therefore, Westfall's report is irrelevant and inadmissible under Rule 702. The Court cannot agree.

## II. Legal Standard

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 was restyled in 2000 to the reflect the changed approach to admissibility issues of expert testimony. The new approach, which was ushered in by the Supreme

Court decision in *Daubert v. Merrel Dow Pharmaceuticals Inc.* refocused the analysis of expert admissibility to the reliability of the methodology used by the expert and away from an exclusive focus on the general acceptance of the science used by the expert. 509 U.S. 579 (1993).

The crux of the inquiry can be generally stated as whether the proffered expert will testify to "scientific knowledge that will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. In other words, will the testimony be reliable and relevant? The *Daubert* Court provided an illustrative list of factors for a trial judge to consider when determining the admissibility of expert opinion. Whether the expert will testify to reliable scientific knowledge that is relevant to the trier of fact is a matter of assessing, among other things: (1) whether the expert's theory or technique "can be (and has been) tested:" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error;" (4) "the existence and maintenance of standards controlling the technique's operation;" and (5) "general acceptance." *Id.* at 592–93.

None of these factors are dispositive to admissibility and the list itself is not exhaustive. In fact, "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id.* at 594. The Court added "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95. The "flexible inquiry" necessitates the trial court assume the mantle of a gatekeeper to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Id.* at 589.

The application of this inquiry was purposefully expanded to all expert witnesses, not just scientific experts, in *Kumho Tire Co., Ltd. v. Carmichael*. 526 U.S. 137 (1999). The Court reasoned that it would be impossible for trial courts to neatly separate scientific knowledge from technical

or other specialized knowledge, and all experts, regardless of the basis of their knowledge, are granted testimonial latitude by Rule 703 "unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* at 147–48.

### III. Discussion

Cardinal's first line of attack contends that Westfall's life care plan, which aggregates medical recommendations made by Wheeler and Dr. Vaglienti, offers opinion that can only be given by a medical expert and Westfall is an expert in life care planning, not medicine. For support Cardinal quotes an opinion from another court in this District. Addressing the foundation needed for a life care plan, Judge Goodwin explained that "[b]ecause . . . [a] life care plan describes particular medical procedures and services, there must be a medical foundation for [the] recommendations. In other words, a doctor or medical expert must opine to a reasonable degree of medical certainty that the items listed in the life care plan are necessary." *In re Ethicon, Inc.*, No. 2:12-MD-02327, 2014 WL 186872, at *12 (S.D. W. Va. Jan. 15, 2014).

The Court finds it necessary to first point out that Cardinal has removed from the quoted language the context in which it was written, which has the effect to obscure its true meaning and application to this case. Immediately following the quoted language, Judge Goodwin notes that the life care plan at issue in that case was not based on any findings or opinions by a medical expert—it was based solely on the recommendations of the life care planner who admittedly was not a medical expert. *Id.* In this case, Westfall based her expert report on the recommendations of two medical experts, Wheeler, an expert in prosthetics, and Dr. Vaglienti. The point Judge Goodwin was attempting to make, and one with which this Court generally agrees, is that a life care planner's testimony, were it to address specific medical procedures or services, the need for

those services must have been endorsed by a medical expert capable of collecting medical information about the victim, assimilating medical research on the medical care of the victim, and providing an opinion based on those findings that was reached by a resort to a reliable methodology.

The quoted language conveys none of Cardinal's desired effect. Read in context, the quote merely reminds the Court of the rather anodyne proposition that an expert in one field cannot opine about an area outside her expertise unless her opinion is based on the opinion of a qualified expert in that field. *See* Fed. R. Evid. 703. That is exactly what Westfall did. She is not a medical expert. She is an expert in life care planning. She relied on the recommendations of medical experts and applied her expertise to those recommendations to create an expert report that attempts to quantify Edwards' future medical needs. The *Daubert* inquiry demands an investigation of reliability and relevance. The reliability of an expert opinion is inescapably linked to the quality of the initial assumptions or foundations from which the expert begins his or her analysis. In this case, the foundation for Westfall's opinion is the medical inquiry done by two medical experts.

At the heart of Cardinal's challenge is a belief that Westfall should not have relied on the opinions of Wheeler and Dr. Vaglienti because they did not render their opinions with the certainty Cardinal believes is necessary for those opinions to be admissible. Latching onto the phrase "reasonable degree of medical certainty" used by Judge Goodwin, Cardinal insists that because some of the future medical needs recommended by Wheeler and Dr. Vaglienti are only possible, not necessary, they were not rendered with a reasonable degree of medical certainty, and are thus inadmissible. Accordingly, Cardinal argues, Westfall could not rely on them for her expert report.

Cardinal's argument is deeply flawed. As an initial matter, for all Cardinal's argument about the certainty of Wheeler's and Dr. Vaglienti's medical recommendations, Cardinal has not

moved to exclude their testimony at trial. While this seeming oversight does not dictate the result of the motion to exclude before the Court, it severely undermines the credibility of Cardinal's argument against Westfall's expert opinion.[1]

Moving to the merits of Cardinal's argument, Cardinal's reliance on "reasonable degree of medical certainty" as the standard for admissibility confuses admissibility with the burden of proof for future medical needs in West Virginia. It also inserts a roundly criticized phrase—"reasonable degree of medical certainty"—into the evaluation of the admissibility of expert opinion in federal court.

Taking up this latter point first, the phrase "reasonable degree of medical certainty" has no relationship to medical science whatsoever. "While some judges and attorneys assume that 'reasonable medical certainty' must be a medical term of art, the meaning of which is well known to physicians, nothing could be further from the truth. Physicians are not accustomed to thinking in terms of certainty." Jeff L. Lewin, *The Genesis and Evolution of Legal Uncertainty About "Reasonable Medical Certainty*," 57 Md. L. Rev. 380, 402 (1998) "[M]edical professionals and other scientists do not routinely express opinions or conclusions 'to a reasonable scientific certainty' outside of the courts." Nat'l Comm'n on Forensic Sci., Dep't of Justice, Recommendations to the Attorney General Regarding use of the Term "Reasonable Scientific Certainty" (Mar. 3, 2016). In fact, its use by experts in court contributes to false sense of confidence in expert opinion and sows confusion about the "objectivity" of the expert's process. *Id.* ("These terms have no scientific meaning and may mislead factfinders about the level of

---

[1] The Court notes that Dr. Vaglienti was identified by Edwards as a witness to be called at trial. Integrated Proposed Pretrial Order 2, ECF No. 98. Wheeler, however, was listed only as a "potential" witness. *Id.* This latter fact does not assuage the Court's skepticism of Cardinal's argument.

objectivity involved in the analysis, its scientific reliability and limitations, and the ability of the analysis to reach a conclusion.").[2] The United States Department of Justice ("DOJ") has gone so far as to recommend that DOJ attorneys refrain from its use in court and that experts testifying on behalf of the United States refrain from using the phrase in reports and testimony. *Id.*

The inquiry detailed by *Daubert* and codified in Rule 702 has no place for a relic of an arbitrary and incoherent demand by the law on science. As the Court has already explained, the *Daubert* inquiry is focused on the reliability of the methodology used and the relevance of that testimony to the trier of fact. Invocation of the talismanic phrase "reasonable degree of medical certainty" has no bearing on whether the methods used by any given expert are reliable. Because the phrase has no relation to scientific inquiry and no stable meaning in the law, resort to it only serves to obscure the reliability of the expert's opinion. *Compare, e.g., In re Twining*, 894 P.2d

---

[2] This discussion ignores two additional black marks against the use of the phrase. First, the phrase itself is incoherent and "has no readily apparent meaning." Jeff L. Lewin, *The Genesis and Evolution of Legal Uncertainty About "Reasonable Medical Certainty,"* 57 Md. L. Rev. 380, 400 (1998). This is because the noun "certainty" carries with it implications of the absolute, while the adjective "reasonable" "qualifies and essentially negates the absolute implications of" "certainty." *Id* at 401. Second, the origin of the phrase is rooted in a peculiar inconsistency in the Illinois Rules of Evidence extant in the early part of the Twentieth Century—the Reasonable Certainty Rule and the Ultimate Issue Rule. *Id.* at 407. The Reasonable Certainty Rule acted at first as a rule of substantive proof to establish future damages, but it also was interpreted to implicate admissibility of expert medical opinion when testifying about future illnesses or conditions. *Id.* at 408. The Ultimate Issue Rule barred definitive expert testimony on the causation of an injury. *Id.* at 410–11. Thus, according to the rules of evidence in effect in Illinois almost a century ago, a medical expert was required to express a medical opinion about future illnesses with "reasonable certainty" but could not express an opinion with a degree of certainty that exceeded the hypothetical. *Id.* at 410–14. (a medical expert "should not be asked whether or not such facts *did* cause and bring about such condition or malady." (emphasis added)). By the mid-1930's personal injury attorneys in Chicago began using the phrase "reasonable medical certainty" to preface hypothetical questions about medical causation posed to medical experts. *Id.* at 425. The phrase then found its way into Goldstein's 1935 manual on Trial Technique and was quickly adopted by nearly every American jurisdiction without regard to its peculiar local origin. *Id.* at 425–54, 456–57 (By 1969 the phrase appeared in published opinions from all but two jurisdictions.). The origin story of the phrase reveals its arbitrary birth, unthinking adoption, and most importantly, its vacuity of meaning. Accordingly, it has no place in the admissibility analysis.

1331, 1336–37 (Wash. Ct. App. 1995) (finding "reasonable degree of medical certainty" to mean "more likely than not") *with Johnston v. United States*, 597 F. Supp. 374, 412 (D. Kan. 1984) (finding a statistical method that shows greater than fifty percent probability insufficient to meet a "reasonable degree of medical certainty"). An examination of reliability should instead concentrate on the logic underpinning the path from premise to conclusion. *Daubert*, 509 U.S. at 594–95. ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). This inquiry naturally includes the factors listed in *Daubert* but also others that may become relevant depending on the kind of technical or scientific evidence at issue.

Accordingly, whether Westfall expressed her opinions about the cost of recommended medical devices, services, and procedures with a "reasonable degree of medical certainty" is, quite frankly, irrelevant to the task at hand. Cardinal makes no attempt to question Westfall's methods to arrive at her conclusions of the costs of certain medical services.

Turning now to Cardinal's first contention that medical expert testimony expressed with any degree of certainty short of a "reasonable degree of medical certainty" bars its admission, Cardinal confuses the plaintiff's burden of proof with the standard for admissibility in federal courts. West Virginia does indeed appear to have a rule of substantive proof that requires future medical needs to be proved with "reasonable certainty."[3] *Hovermale v. Berkeley Springs Moose*

---

[3] The reasonable certainty standard has not gone without critique from West Virginia jurists, however. Chief Justice Menis Ketchum of the West Virginia Supreme Court of Appeals has questioned the wisdom of requiring medical experts to opine to a reasonable degree of medical certainty when providing testimony on future pain and suffering. *Toothman v. Jones*, No. 11-0960, 2012 WL 5687865, *3–*4 (W. Va. 2012) (Ketchum, C.J., concurring). Based on similar grounds to the Court's reasoning in this Opinion, Chief Justice Ketchum proclaimed "[r]equiring a medical doctor to opine to a 'reasonable degree of medical certainty' should be abolished." *Id.* at *3 (citing Jeff L. Lewin, *The Genesis and Evolution of Legal Uncertainty about "Reasonable Medical Certainty,"* 57 Md. L. Rev. 380 (1998)). The Court agrees with Chief Justice Ketchum. No matter the context, the phrase has no coherent meaning and should be torn out root and branch from the legal lexicon.

*Lodge No. 1483*, 271 S.E.2d 335, 340 (W. Va. 1980) (quoting *Pygman v. Helton*, 134 S.E2d 717 (W. Va. 1964)). Notwithstanding, the standard for admissibility of expert opinion in federal courts is found in Rule 702. Nowhere in that Rule nor any other rule of evidence, nor any Supreme Court decision on expert testimony, is a particular degree of certitude required for admission of expert testimony. To return to *Daubert*, the touchstone of the inquiry is the reliability of the expert's methods to arrive at a particular conclusion and that conclusion's relevance to the case at hand. It is then the province of the factfinder to determine whether the evidence proffered meets the burden of proof imposed on the plaintiff.

The danger of expert testimony is that it will be accorded a weight by the factfinder it is not due because the authority of the expert conceals the analytical leaps or unfounded assumptions on which his or her conclusion is based. It is the duty of the trial court to examine the expert's assumptions and the strength of the connections between them and the conclusion to which the expert will testify. Once the trial court has made the appropriate inquiry and is satisfied that the expert's opinion does not flow arbitrarily from a whim but from the disinterested operation of reason, the factfinder can trust that the expert arrived at the conclusion soundly. With the assurance that the trial process will not be corrupted by a capricious expert, the factfinder can decide for itself the weight to accord relevant expert testimony.

Westfall's opinions, although not scientific, incorporate technical expertise on the pricing of medical devices, procedures, and services that are recommended by doctors and other medical experts. Westfall's report is not peer reviewed and there is no error rate associated with it. The Court would not expect there to be. The Court must instead assess the methods used by Westfall to arrive at her conclusions of the cost of the recommended medical services.

Westfall extensively reviewed Edwards' medical records created after the injury, including records for his original hospital stay and Dr. Vaglienti's and Wheeler's reports. She used this information along with recommendations from Dr. Vaglienti and Wheeler to compile a list of future medical needs and assigned a cost to each. Depending on the item or service recommended, Westfall resorted to different online resources to assign a cost or range of costs to that item or service. Cardinal takes no issue with these methods, other than reliance on the medical experts, which has been discussed extensively above, and the Court has no reservations about them.

Moreover, Westfall's opinion is relevant to the factfinder. Her testimony will be helpful to the jury should it decide to award Edwards damages. Costs of medical procedures, services, and devices are not common knowledge and Westfall's testimony will prove useful for the jury in its calculations of any damages it chooses to award Edwards for his injury.

As the Court finds no fault with Westfall's report, and has not been presented with motions to exclude the testimony of Wheeler and Dr. Vaglienti, the Court denies Cardinal's request to also exclude the testimony of Edward's expert Daniel Selby because it is based on Westfall's expert report.

### IV. Conclusion

For the reasons stated, Defendant's Motion to Exclude is **DENIED**. ECF No. 100.

ENTER: August 22, 2017

_____
ROBERT C. CHAMBERS, CHIEF JUDGE