IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

RICHARD EDWARDS, JR.,

            Plaintiff,

vs.                        No. 3:16-CV-01879

MC ELLIOTTS TRUCKING, LLC;
DANNY MC GOWAN, individually and
as an employee of McElliotts
Trucking, LLC and/or as agent of
Cardinal Transport;
CARDINAL TRANSPORT, INC.,

            Defendants.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

TUESDAY, OCTOBER 10, 2017, 9:28 A.M.

---o0o---

For the Plaintiff:    WESTON ROBERTSON
                      337 Fifth Avenue
                      Huntington, West Virginia  25701
                      BY:  CONNOR D. ROBERTSON


For Defendants         HARDY PENCE
McElliotts Trucking    Post Office Box 2548
LLC, Danny McGowan     Charleston, West Virginia
and Harold Midkiff:    BY:  CHARLES F. BELLOMY

(Appearances continued next page...)


Reported by:  KATHY L. SWINHART, CSR
              Official Court Reporter
              (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

1                        APPEARANCES (Continued)

2

     For Defendant Cardinal Transport, Inc.:
3
                        FLAHERTY, SENSABAUGH & BONASSO
4                       Post Office Box 3843
                        Charleston, West Virginia  25338-3843
5                       BY:  BRADLEY J. SCHMALZER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1        HUNTINGTON, WEST VIRGINIA

2        TUESDAY, OCTOBER 10, 2017, 9:28 A.M.

3                ---o0o---

4        THE COURT:  Good morning.

5        Would you note appearances for the record, please?

6        MR. ROBERTSON:  Connor Robertson on behalf of the

7    plaintiff, Richard Edwards, Jr.

8        MR. SCHMALZER:  Bradley Schmalzer on behalf of

9    Cardinal Transport, Inc.

10        MR. BELLOMY:  Charles Bellomy for McElliotts

11    Trucking, Danny McGowan and Harold Midkiff.

12        THE COURT:  All right.  Thank you.

13        Well, we're here pursuant to defendant Cardinal's

14    motion, actually two motions as I recall.  One is a motion

15    seeking a Daubert hearing with regard to plaintiff's expert

16    on the basis for his liability opinions.  And the other is

17    sort of a similar motion in limine to restrict or prohibit

18    plaintiff from offering evidence or argument that OSHA

19    applies.

20        So I've gone through the supplemental response that

21    I required of the plaintiff and then the defendant's

22    subsequent reply for that.  As I understand it now -- well,

23    Mr. Robertson, why don't you just summarize -- and I'm going

24    to ask you to move the microphone closer to you.

25        Why don't you summarize, given your supplemental

1   response, precisely what you believe your expert would be

2   able to testify to.

3        MR. ROBERTSON:  Thank you, Judge.

4        Just very simply, our expert, Mr. Rugemer is a -- is

5   no doubt qualified in OSHA regulations within the loading

6   and unloading of trucks, especially flatbed trailers.  Not

7   only is he an expert in OSHA regulations, he is certainly an

8   expert in transportation of tractors and trailers, loading

9   them.  And, in fact, he's a warehouse manager that -- that

10  oversaw the safety of warehousing, loading and unloading and

11  things like that.

12       We have no doubt that he would be -- based on his CV

13  and experience in the industry, that he would be qualified

14  to give opinions as to OSHA as they relate to power trucks,

15  power industrial trucks or forklifts.

16       THE COURT:  Well, how does he now claim that the

17  OSHA regulations relate to the specific site and incident

18  that occurred here?

19       MR. ROBERTSON:  Correct.  So the two OSHA provisions

20  that he will testify to are, one, an industry safety

21  provision that is kind of overarching of 1910.178, which is

22  the forklift provision.  And the testimony in that regard

23  will -- and we've restricted -- as our brief said, we've

24  restricted his opinions to two things.

25       One, that an operator of a forklift must ensure the

1    safety of others that are in the fall shadow, meaning in the

2    area in which freight can come down and off the truck or off

3    the forklift.  There is no specific provision in OSHA that

4    talks about fall shadow.  However, it is -- based on OSHA's

5    interpretive guidelines, it is an industry standard.  And

6    Mr. Rugemer will also testify that in the trucking industry

7    in loading and unloading of flatbed trailers, that it's an

8    industry safe practice without OSHA.

9         So the specific testimony will be that, with regard

10   to what was going on here, that the standard of care for a

11   forklift operator in loading and unloading trucks is to

12   ensure the safety of either pedestrians or workers in the

13   area as it relates to the fall shadow; that he would have,

14   he being the operator of the forklift would have ultimate

15   responsibility to keep these people out of the fall shadow.

16        And then secondly he will opine on the use of free

17   rigging, which is OSHA 1910.178(a)(4).  And, again,

18   Mr. Rugemer will rely on the interpretive guidelines and

19   OSHA's interpretation of that specific provision because it

20   doesn't come out and say free rigging.  It says that no

21   individual should use modifications or attachments to a

22   forklift without the manufacturer's written approval and/or

23   a qualified engineer's written approval.

24        So pursuant to OSHA and the interpretive letter that

25   Mr. Rugemer cited within his report, the slings, the nylon

1    straps that were hanging from the tines of this forklift,

2    with nothing else, is considered by OSHA a modification or

3    attachment.

4         And then he will go on to opine, again, that not

5    only is that an OSHA standard, that in the trucking industry

6    in loading and unloading flatbed trucks with forklifts, that

7    the standard of care if you are going to free rig -- and I

8    think there was some confusion on my part by saying free

9    rigging is outlawed.  If you are going to free rig, you can

10   do that, but you have to have the manufacturer's written

11   approval, a qualified professional engineer's approval or

12   some after-market device that is approved for that forklift

13   to ensure the safety that the load will not fall.

14        And the reason for this is because if you're hanging

15   shingles or straps below the tines of the forklift, there is

16   nothing to ensure them to fall off.  There's no provision.

17   So within the trucking industry, you cannot free rig without

18   these -- an approved device or some safety attachment.

19        So we are going to restrict his testimony only to

20   those two issues.  And specifically, because of Fourth

21   Circuit case law, we are only offering him to establish some

22   evidence of negligence or the standard of care when you're

23   operating a forklift in loading and unloading a flatbed

24   truck.  That's not something that the jurors are going to be

25   knowledgeable about.  And we simply -- and the Fourth

1    Circuit in the Albrecht opinion has identified that that is

2    allowed as some evidence of negligence.

3            Whether it go to standard of care, the court can

4    obviously give -- and did in Albrecht, give a limiting

5    instruction that it's not conclusive or binding.  It just

6    provides the trier of fact testimony that when these things

7    are going on, that this is -- this is how it's supposed to

8    happen.  It's not -- it's not requiring -- or Mr. Rugemer's

9    expert opinion is not going to usurp any duty argument.

10   It's simply to the standard of care when these forklift

11   operations are going on with regard to the loading and

12   unloading of trucks.

13           So Mr. Rugemer is experienced in the trucking

14   industry.  He's going to testify that he's been a safety

15   manager for things like this, specifically for the loading

16   and unloading of trucks.  He's been qualified as a forklift

17   operator.  He trains forklift operators.  He trains trainers

18   of forklift operators, and specifically within warehousing

19   and loading these trucks.

20           And he's not going to come out and say McElliotts or

21   McGowan or Midkiff or Cardinal violated any of these

22   standards based on our knowledge of the Fourth Circuit, but

23   he can testify to the fact that these are the industry

24   standards.  And he could respond to hypotheticals, if

25   this -- if this is free rigging, if this is not free

1   rigging.

2        But we're not asking him, and I don't think we can

3   based on the Albrecht opinion, to stand before the jury and

4   tell them that McGowan violated this.  It's just another

5   piece of evidence for the jury's consideration because

6   they're not going to be knowledgeable on this thing.

7        And then -- so that -- I mean, that's essentially

8   it.  It's very limited.  It's very narrow.

9        And I guess in responding to the Fourth Circuit law,

10  the Albrecht opinion relies on this Melerine Fifth Circuit

11  opinion.  And Cardinal's argument is that they agree with

12  the Albrecht opinion, that it can be offered for standard of

13  care evidence, but what they're saying is it can only be

14  offered in standard of care if Mr. Edwards was working for

15  an employer; in other words, if he was an employee of

16  McGowan's.

17       And our argument would be that that is a miss -- a

18  misconception of that Melerine opinion because -- and I read

19  it again last night.  The whole opinion of Melerine, the

20  whole -- the whole first, I think, three pages is

21  specifically limited to the analysis of -- let me grab it

22  here.

23       I don't disagree that that's what -- the way it

24  starts out.  But if you read the first, I think, five pages

25  of that opinion, it clearly is identifying that they are

1    addressing negligence at law, negligence per se.  And the

2    problem, Your Honor, is that OSHA has a provision that says

3    our OSHA regulations are not to be construed as providing an

4    independent action to plaintiffs.

5         So the courts, in dealing with that, in dealing with

6    plaintiffs trying to use OSHA as per se negligence or trying

7    to create an independent cause of action have been shut down

8    on that, and that is what -- the first, I think, five to six

9    pages.

10        But if you go to -- I believe it's on page 713 of

11   the case, so it would be 659 F.2d 706 on page 713.  The

12   argument for Melerine, who is trying to use these, is

13   exactly what plaintiff is doing here.  He's trying to use

14   this evidence as negligence in fact, just some evidence of

15   negligence.  And in the paragraph that has footnote 22, and

16   this is very important, it recognizes that the court made

17   the switch from talking about negligence in law, and it goes

18   to now we have to -- now, quote, having decided that

19   Avondale was not negligent in law, we now deal with

20   Melerine's second contention that Avondale was negligent in

21   fact.

22        So it goes on, and it says:  Melerine contends that,

23   as a matter of reasonable prudence, Easter should have

24   appreciated Melerine's hazardous exposure and closed down

25   his crane.  He bases this contention on the ground that both

1    the lifting operation itself, which Melerine says was

2    inherently unsafe, and the OSHA regulations and ANSI

3    standard discussed above should have led Easter to

4    appreciate the hazard, which is what we're doing here.

5         If you go -- it cites footnote 22.  And if you go to

6    that footnote, it says:  This use of the OSHA regulations

7    and ANSI standard differs from their use to establish

8    negligence per se.  Here, Melerine is using the regulations

9    only as evidence of negligence, which the trier of fact may

10   accept or reject as it sees fit.

11        And it quotes Prosser:  A plaintiff may properly

12   offer a statute or regulation as evidence of a defendant's

13   negligence even when that statute or regulation cannot be

14   used as the negligence per se.  And it cites the Amsterdam

15   case of the Fourth Circuit.

16        So I agree with Cardinal's contention that we can't

17   use this as evidence of negligence per se because that would

18   usurp OSHA's authority, and OSHA says that you can't do

19   that.  But as to negligence in fact, some evidence of the

20   standard of care, the Court can allow this testimony and

21   instruct the jury that it's not -- as it did in the Albrecht

22   opinion, this is not binding or conclusive on anyone.  It

23   can be taken as a whole or in part, however you see fit, as

24   some evidence of what was going on here.

25        THE COURT:  If I now find, and I think you've

1    suggested this in your supplemental response, that OSHA

2    literally doesn't apply, that it does not set a standard of

3    care in this setting, on what basis would your expert

4    nonetheless testify that OSHA standards somehow are evidence

5    of negligence?

6         MR. ROBERTSON:  Well, it's our contention that OSHA

7    certainly does apply, and he would be -- he's here today

8    willing to walk through the analysis of that.  But

9    regardless, based on Fourth Circuit law, I don't think we

10   can make that argument.

11        So that leaves us to what -- how can he suggest to

12   the jury is, A, that OSHA regulates this kind of activity.

13   In fact, even Cardinal's expert, I asked him, and I put it

14   in my supplemental brief, is there anybody who regulates

15   this kind of activity other than OSHA?  I think his only

16   response was ANSI.  So with regard to the operation of a

17   forklift, OSHA and ANSI really provide the regulatory

18   oversight on how this operation is supposed to be safely

19   done.  So he can testify as to OSHA -- these provisions

20   simply provide guidance on how an operator is allowed to

21   operate in this factual scenario.

22        But even if you throw OSHA to the side, Judge, based

23   on Mr. Rugemer's industry experience, forklift experience in

24   loading forklifts, he's clearly qualified to testify as to

25   how forklift operators should -- within the industry, should

1    conduct this operation in a safe manner.

2         And the provisions are the same.  Free rigging isn't

3    mentioned within OSHA because it's an industry recognized

4    practice.  That's -- it came from jerry-rigging.  People who

5    do this recognize that this is an issue, and this is a

6    safety issue.

7         The same as the fall shadow thing.  You don't find

8    fall shadow in OSHA.  It is an industry recognized, ah,

9    safety practice.  And so essentially he says that if you're

10   going to be operating a forklift, then the industry safe

11   practice dictates that you keep people out of the fall

12   shadow when you're doing this.  And that if you're going to

13   free rig, then you keep -- you do it by manufacturer's

14   approval or you get a safe attachment.

15        And it just gives them -- people who aren't

16   qualified and probably don't operate forklifts, it gives

17   them the opportunity to understand, okay, in this particular

18   industry, this is how it's supposed to be done.

19        And then -- and then we're done.  That's the extent

20   of Mr. Rugemer's --

21        THE COURT:  Before you sit down, let's turn to the

22   other issue that Cardinal has raised, and that is your

23   attempt to use the expert to testify about defendant

24   Cardinal's knowledge of Mr. McGowan's practice of

25   temporarily unloading and then later consolidating

1    shipments.

2          MR. ROBERTSON:  I didn't see any -- I didn't -- I

3    was unaware that they contested his opinion as to knowledge.

4    I thought it was strictly as to OSHA.

5          Am I wrong?

6          THE COURT:  No.  Yeah, they also --

7          MR. ROBERTSON:  Well, I mean, it's simple.

8          In his industry, he works, Mr. Rugemer works as a

9    dispatcher.  He's worked as a logistical manager for several

10   fleets of tractors and trailers.  And his warehousing, he

11   provided oversight, ah, to similar software systems that

12   provide logistics and track these trucks going all over.

13         And his testimony is limited to in this type of --

14   in this type of operation, that -- and I can't imagine that

15   Cardinal would dispute this, that once these loads are

16   identified and given product numbers by Cardinal, they are

17   called in to dispatch and logged into a software tracking

18   system, which we have asked for and received in discovery.

19         And this court recognized in the summary judgment

20   order that these product numbers were called in by the

21   drivers.  Their software management system shows these

22   product numbers going on the same truck on a delivery, and

23   that the dispatch -- this was called in to dispatch, the

24   dispatcher logs this information, and that's how, ah,

25   trucking conglomerates track their loads that they're

12

1   responsible for.

2           THE COURT:  If the documents speak for themselves,

3   why do you need to call an expert?

4           MR. ROBERTSON:  Well, I don't think -- I mean, it's

5   our position that the documents are pretty clear, but

6   they're mounting a defense to that.  They're saying that

7   nothing -- their argument is nothing in this document --

8   well, their argument is nothing in this document speaks for

9   itself.  In other words, what in this document shows that

10  Cardinal would -- shows knowledge by Cardinal that this

11  consolidation isn't taking place on Special Metals yard.  So

12  it's our opinion the documents speak for themselves, but

13  their challenge is that they don't.

14          And Mr. Rugemer, based on his trucking industry

15  experience with logistical and dispatching, can testify to

16  the software management, the dispatching aspect of it, how a

17  dispatcher receives this information and logs it into a

18  computer, which would testify -- and if you remember, Judge,

19  we provided that expert opinion as a supplement once they

20  raised the knowledge defense.

21          So even if it's not in their case in chief, once

22  they bring out evidence that we didn't know anything about

23  this, we should be able to rebut that evidence with his

24  experience and training that this -- ultimately it is -- he

25  says it's impossible for them not to have known this.  But

1    he can use his experience in logistics to testify how the

2    corporation would know about these load consolidations.

3            THE COURT:  All right.  Thank you.

4            Mr. Schmalzer?

5            MR. SCHMALZER:  Thank you, Your Honor.

6            Mr. Robertson has gone through a lot, so I'll try to

7    kind of take a few steps back and address the initial

8    question of, you know, what relevance does OSHA have to this

9    case?

10           You know our position.  Our position is that it's

11   irrelevant, and that's because OSHA, by its statutory

12   language and regulatory language, only governs relationships

13   between employers and employees.  There are certain

14   instances where it may apply to an independent contractor

15   working for a contractor, things like that.  But by its

16   specific wording, language and interpretation, it does not

17   apply in situations outside of the employer/employee

18   context.

19           Additionally, it does not apply to the

20   self-employed.  Somebody with no employees is not an

21   employer.  For example, I could go buy a forklift and drive

22   it around my yard all day long.  OSHA can't come in and cite

23   me.  I'm not an employer.  I'm not employing anybody.  I

24   don't have anybody to protect.  Okay?

25           And so what the plaintiff's counsel would like the

1    Court to do is ignore the strict application of OSHA and

2    allow their expert to opine as to the standard of care

3    imputed upon employers to somebody who is not an employee.

4         And plaintiff's counsel, you know, he correctly

5    cited Albrecht for the proposition that this can be used to

6    establish the standard of care in a negligence context.

7    However, the specific language used in that case is between

8    an employer and an employee.  In all of the cases examining

9    this issue, I have not found one yet where a court will

10   allow evidence of the standard of care through OSHA regs to

11   apply outside of the employer/employee context, whether it's

12   to establish negligence per se, whether it's to establish a

13   standard of care.  I did cite to a number of opinions that

14   reiterate this point.

15        There was one decision I believe I cited to that --

16   it might have been Davis.  But, anyways, they explored

17   another way that it could be used to establish the standard

18   of care.  And in that case, the suit was against a product

19   manufacturer, and the product manufacturer defendant moved

20   to exclude any references to OSHA's standard of care with

21   regard to the regulations because there was no

22   employer/employee relationship between the plaintiff and the

23   product manufacturer.  And the court agreed, they said they

24   couldn't use it for that purpose.

25        The court did, however, contemplate certain

1    circumstances where it could be applicable.  So, for

2    example, if the product manufacturer specifically adopted

3    OSHA standards in designing its equipment, something along

4    those lines, something to make it relevant to the case.

5    That's not something that exists here.

6         I don't think plaintiff has ever and is now

7    contending that there is an employer/employee relationship

8    between McElliotts and McGowan, making him at best an

9    invitee or a volunteer on that property.  The evidence as

10   developed in this case shows that McGowan was self-employed.

11   Those two factors in mind, a self-employed individual is not

12   subject to OSHA regs, an employer is not held to the

13   standard of care to employees -- to invitees on the

14   property, in the end any testimony with regard to OSHA's

15   standard of care would be, I think, incorrect.

16        THE COURT:  If I agree with you and find that OSHA

17   does not apply, so it does not set a regulatory standard of

18   care applicable to this incident, and preclude the expert

19   from making any reference to OSHA, do you agree that he

20   would still be able to testify that, based upon his

21   experience in the industry, industry practices, for instance

22   only to do free rigging in certain circumstances, only to

23   operate a forklift in this manner or that there's a manner

24   in which in the trucking industry with regard to loading and

25   unloading here there are safe ways to use a forklift and

1   unsafe practices that should be avoided, and that in this

2   case the operator of the forklift engaged in an unsafe

3   practice?

4        MR. SCHMALZER:  I would if I believed that he were

5   qualified to testify to that specific free rigging, ah,

6   practice, as we'll get to.  I don't -- in a perfect world,

7   if I believed his expert was 100-percent qualified to offer

8   those opinions, then I would say that, yeah, that would

9   probably be a way for him to introduce evidence of the

10   standard of care.

11        THE COURT:  Well, why here, given his resume and the

12   description of his work at his deposition, do you believe

13   that he does not possess the knowledge or experience

14   necessary to offer opinions about practices in the industry?

15        MR. SCHMALZER:  I think specifically the issue is

16   free rigging.  I think if this were a run-of-the-mill

17   forklift loading a pallet onto the back of a truck case,

18   then I would have less issue.  But in this case, Mr. Rugemer

19   has admittedly no experience with the practice.

20        In addition to that --

21        THE COURT:  Well, with the practice --

22        MR. SCHMALZER:  Of free rigging.

23        And, you know, his opinions in that regard are

24   entirely derived from OSHA's guidance on the issue.  Of

25   course, we argue that doesn't apply here.  But even if it

1    did, we don't believe the facts in evidence in the record

2    are adequate to uphold his opinions as they are derived from

3    the OSHA guidelines.

4        There is no factual basis for many of his opinions

5    with regard to how this accident occurred, what caused it,

6    what specifically about the act of free rigging contributed

7    to the incident.  There's a lot of issues, and we will

8    develop that, but I do not believe that he has the

9    knowledge, experience and qualifications to opine in that

10   regard.  Nor do I think he has the qualifications to testify

11   with regard to the application of OSHA, period.

12       THE COURT:  I guess perhaps it's just not really

13   sinking in with me what you believe he is required to

14   demonstrate to be able to testify about the practice of free

15   rigging in the setting which he seems to have spent his work

16   history in, dealing with, among other things, the loading

17   and unloading of trucks in a commercial transportation

18   setting.

19       MR. SCHMALZER:  Well, he -- Mr. Rugemer testified

20   again in his deposition that, you know, he does not deal

21   with rigging or hoisting; that he has others in his office

22   he would typically refer rigging and hoisting cases to, but

23   he took this case on because it involved a forklift.

24       Now, I may be the world's best auto mechanic, and I

25   could fix everything on a car, but if I've never rebuilt an

18

1     engine, it might be outside of my expertise.  I think that

2     this is an analogous case, maybe not as complicated.

3          But to the extent he has zero experience with the

4     process -- and this will kind of flow into what, you know --

5     and I don't know if plaintiff is, again, going to introduce

6     Mr. Rugemer for purposes of establishing causation.  But to

7     the extent he's allowed to go there, I just don't think

8     there is enough factual underpinnings or knowledge there for

9     him to make those opinions.

10          So, anyways, to the extent, you know, plaintiff has

11     to establish the standard of care somehow, I think industry

12     standards are probably the way to do it.  I don't think the

13     OSHA standards are necessarily industry standards.

14          And with regard to OSHA being the only guidance with

15     regard to the standard of care for forklifts, there was a

16     confusing exchange during my expert's deposition where the

17     words standard, regulation and rules were thrown about.  And

18     our guy testified that, you know, OSHA does apply and, you

19     know, there are ANSI standards that apply.  There are a

20     variety of industry groups and outfits out there that

21     establish industry standards for operation of vehicles.  I

22     mean, you can look at manuals, things of that nature.  So

23     there are a variety of sources for that information.

24          THE COURT:  Well, here's the concluding lines of the

25     expert's report, his initial report.

19

1          Besides being recognized by OSHA to be a potentially

2    dangerous practice, industry safety experts acknowledge the

3    potential dangers, colon, and then it has an insert of an

4    article from the Forklift Safety Newsletter dated April 2016

5    entitled What's Wrong with Free Rigging, which goes on to

6    explain what free rigging is and why it's hazardous and how

7    it perhaps could be done.

8          So it seems to me he's identified an industry

9    practice recognized -- that he's testified is recognized by

10   forklift operators generally in the setting of loading and

11   unloading for commercial transport.  So what else do you

12   think he needs to explain in order to have that opinion?

13          MR. SCHMALZER:  One of the issues with his opinion

14   is that none of the hazards implicated with the practice of

15   free rigging are relevant or alleged to have been the cause

16   of the injuries in this case.  So the concerns related to

17   free rigging are instability of the forklift itself.  You

18   know, if you lift a load and it's moving underneath, it can

19   affect the capacity and stability of the forklift causing

20   the forklift to tip.

21          The only other concern I'm aware of that's been

22   raised in the literature on the issue is from a load perhaps

23   swinging or hitting a bystander or a spotter or something

24   along those lines.

25          The third issue is the potential for a load to slip

1    off the forklift, right?  Now at first glance, and on first

2    impression, that may sound relevant to this case, but the

3    testimony is fairly uniform in that the load here had

4    already been placed on the truck.  Okay?  And that it was

5    the intent for the load to be disengaged from the tines of

6    the forklift.

7          All of the concerns addressed in the free rig

8    literature and by specialized free rigging attachments are

9    to keep the load on the forklift.  Okay?  So the concern is

10   things coming off of the forklift unexpectedly, not staying

11   on the forklift unexpectedly.

12         Does that make sense?

13         THE COURT:  Well, perhaps.  I don't know if that's

14   what the --

15         MR. SCHMALZER:  So, again, I would say that none of

16   the literature or concerns that are raised by the practice

17   of free rigging -- and it's on our contention that he wasn't

18   even free -- he wasn't actually free rigging when this

19   occurred since the load had been placed in the truck.

20         THE COURT:  So what do you all contend happened?

21   Maybe I don't have a really deep understanding.  I know

22   we're talking about big, long pieces of pipe basically, and

23   there were already some on the truck.

24         MR. SCHMALZER:  Uh-huh.

25         THE COURT:  So it does seem that he was using free

21

1    rigging to have the forklift lift up each of these pipes and

2    then to place them.

3           And so you're saying here he had already placed this

4    pipe, and he was -- so it was no longer being suspended or

5    held --

6           MR. SCHMALZER:  Correct.

7           THE COURT:  -- by the forklift.

8           MR. SCHMALZER:  Correct.

9           THE COURT:  It was down, and it was -- what he was

10    doing?  Was he backing the forklift out to release the sling

11    or whatever he used to hold the pipe to the forklift tines?

12           MR. SCHMALZER:  That's exactly right.

13           And I'll be honest, we don't know exactly what

14    caused the rod to fall.  It had been placed in between two

15    other rods, so it was cradled between them.

16           THE COURT:  And that is the rod that hit him; is

17    that correct?

18           MR. SCHMALZER:  That is the rod that hit him.

19           But we can rule out a few things.  And one of the

20    things we can rule out is that the straps were still

21    attached to the tines of the forklift, thus pulling it off.

22           THE COURT:  So it's clear they were not at that

23    point --

24           MR. SCHMALZER:  Because if they had not been, the

25    rod could have never touched the ground.

1          So our expert has witnessed demonstrations of this

2     practice.  He's seen it done a couple times.  He's watched

3     it done.  And to the best of his ability, he's ruled out

4     that the forklift pulled this rod off and has opined that

5     the most likely scenario is that the rod that was placed on

6     top of the other two was not centered.  And that somehow,

7     you know, either by the fact that -- there could be a number

8     of things that made it fall.  We can't pin it on anything.

9          But one thing is sure, that it would have been too

10    heavy if there was slack for it to be pulled off, and that

11    any -- you know, anything could have caused it to fall.

12         I mean, I think plaintiff testified he was sitting

13    there hammering chocks in right underneath it when it fell.

14    I mean, it could have been hitting a rod.  It could have

15    been hitting the truck.  We don't know.  But what we do know

16    is that it was not being free rigged when it fell.  It had

17    been placed on the truck already.

18         THE COURT:  Okay.

19         MR. SCHMALZER:  Thus, none of the implications or

20    concerns associated with free rigging are really brought

21    into play.

22         THE COURT:  So really, in your view, this is a

23    matter that perhaps the forklift operator simply placed the

24    pipe in the wrong spot?

25         MR. SCHMALZER:  Potentially.  And with the

1    assistance and guidance of Mr. Edwards, who was directing

2    the activity at the time.

3         THE COURT:  Okay.  Anything else on that point?

4         If not, you can turn to this other -- the printout

5    in the expert's --

6         MR. SCHMALZER:  Yeah, sure.

7         So the printout, the printout was a screenshot from

8    Cardinal's dispatching program.  Based upon this screenshot,

9    Mr. Rugemer deduced that Cardinal had to be -- had to know,

10   had to know that Danny McGowan was consolidating loads in

11   his yard.

12        Now, throughout this litigation, I'm not so sure

13   we've ever really contested that Cardinal could have known

14   or may have known that Danny McGowan, and probably other

15   operators, consolidated loads.  What Cardinal doesn't know,

16   couldn't know and did not know, and is not evidenced by this

17   screenshot, is that Mr. McGowan was doing it himself at his

18   yard using a volunteer, using a forklift, free rigging, none

19   of that.  At best, all the screenshot can show is that

20   multiple loads were placed on the same trailer.  That's it.

21        THE COURT:  Multiple loads picked up on different

22   days?

23        MR. SCHMALZER:  Correct.  That's the only thing you

24   can extrapolate there.

25        And to the extent that an individual running this

1    dispatching program should even care to look to see if folks

2    are consolidating loads because, again, outside the scope of

3    their arrangement with Cardinal and most other operators, it

4    doesn't -- it doesn't show or prove anything.

5          In the end, nobody is looking for that anyways.

6    That's not the way the program is supposed to be used.

7    That's not what it's for.  And they would be required to sit

8    and look for this information all day long, and to what end?

9    They're not in the business of overseeing, directing and

10   controlling the day-to-day loading and unloading activities

11   of every independent operator that drives under their --

12   under their banner.

13         So this is not, by Mr. Rugemer's own admission, an

14   uncommon practice.  This is common in the industry.  It's a

15   very efficient way to do business.  I mean, there's nothing

16   illegal about it.  There's nothing dangerous about it.

17         But, again, what it does not show is that Cardinal

18   knew or should have known that Danny McGowan was

19   consolidating loads in the manner and using the means that

20   he was.

21         THE COURT:  Okay.  Thank you.

22         All right.  Reply?

23         MR. ROBERTSON:  Judge, on the first issue, regarding

24   if the evidence of the standard of care only applies to

25   employees to their employers, if you look at the Albrecht

1    case itself -- I can't remember the name, and I meant to

2    print it off -- there's like a 1965 opinion, a Fourth

3    Circuit opinion that was referenced and discussed in that

4    where a longshoreman was suing the ship owner.  And the ship

5    owner wasn't held to be his employer, but yet there was

6    still the allowance of some evidence of negligence to go on,

7    ah, despite that.

8         Then you get to the Albrecht opinion that admittedly

9    in that case it was an employee versus his employer.  But

10   there's the heavy reliance from Albrecht on that Melerine

11   case, which I've already discussed.

12        So it's our position that you can, and it has been

13   supported that you can use evidence of a standard of care in

14   this industry just as some way to educate the jury as to how

15   this thing is supposed to be done.

16        Moving on to Mr. Rugemer's qualifications on free

17   rigging, Mr. Rugemer's opinion and background, training and

18   experience will definitively be that he has no experience in

19   free rigging in the nature in which Mr. McGowan was free

20   rigging.  However, he can testify to the use of the forklift

21   using approved attachments to load and unload material on

22   the -- on the backs of flatbed trucks.

23        To the extent that they use his quote or our quote

24   in the brief that he has no practical experience in free

25   rigging, it is with the caveat that not free rigging as was

1    going on here, he certainly can testify as to the use of

2    forklifts with approved attachments, whether it's OSHA or

3    industry practice, to say that you can free rig if you do it

4    right.  And that's not what was going on here.

5           But nonetheless, again, we're narrowing our -- based

6    on the Fourth Circuit law, we're narrowing our opinions by

7    Mr. Rugemer to simply this is the -- this is the practice.

8    This is how this is supposed to happen.  This is what the

9    industry practice and safety requires.

10          We're not asking him to go on now -- because I don't

11   think honestly we can.  We've conceded that point.  We can't

12   go on to say McGowan did this, he did this, so therefore he

13   did this wrong.  We can't do that.  We simply want the

14   standard of care to be put forth for the jury, and he has

15   the industry experience to allow -- or he's certainly

16   qualified to testify to that.

17          Their argument -- and I think that morphs into their

18   argument that there's no factual basis for this free rigging

19   to take place.  And, again, I would say that we're not

20   asking him to opine on the factual basis for anything.  But

21   even if we were, we can certainly call Mr. McGowan and

22   Mr. Midkiff and Mr. Edwards, who already testified in his

23   deposition, and create a factual evidentiary basis before

24   Mr. Rugemer even takes the stand.  It's not his obligation

25   based on that standard of care to say what is going on

1    because we specifically limited him from that.

2         The use of free rigging requires written

3    manufacturer's approval or the manufacturer's manual for the

4    particular forklift.  And the testimony in this case was

5    that Mr. McGowan, who had bought the forklift from Cardinal,

6    never received an owner's manual, never requested one.

7         The evidence is certainly going to be that

8    Mr. McGowan -- or we anticipate it to be that Mr. McGowan

9    has ever written Hyster and received a letter saying that

10   you can do it this way.

11        THE COURT:  Well, what about Mr. Schmalzer's point

12   that the point at which this subject pipe became a hazard to

13   your client was after it had been loaded by free rigging or

14   not?

15        MR. ROBERTSON:  Right.  It's a -- it's a factual

16   dispute.  I mean, that is absolutely not what we're going to

17   put on evidence of.  Our evidence is that in fact one of the

18   slings was still attached to the forklift at the time the

19   pipe fell off the truck.

20        THE COURT:  And still being -- the pipe was still

21   being suspended or held by that?

22        MR. ROBERTSON:  Correct.  Correct.

23        Because under Mr. Edwards' version of events, it was

24   being -- if this table is the -- long ways is the trailer,

25   the forklift boomed out over to the other side to pick this

1    individual pipe up, which would require the straps to be on

2    the end of the tines.  It has to be.  That he booms it up,

3    picks it up, he raises and brings it back to the edge of

4    this side of the truck.  And at that point, the operation --

5    he lowers it into place, at which point Mr. Edwards starts

6    knocking a block into it.  Which is contested, because

7    Mr. McGowan says that there were already blocks in it, and

8    Mr. Edwards says, no, I was in the process of blocking the

9    pipes.

10            THE COURT:  The pipes or the pipe that fell?

11            MR. ROBERTSON:  Well, the pipe --

12            THE COURT:  The pipe.

13            MR. ROBERTSON:  The pipes on the edge, which were

14   chocked in by rocks at the time.

15            THE COURT:  Already loaded?

16            MR. ROBERTSON:  Correct.

17            So he lowers it down.  The operation goes he lowers

18   it down and puts it into place, Mr. Edwards chocks it in,

19   and then the operation is done.

20            And while the chocking was going on or Mr. Edwards

21   was blocking it, admittedly Mr. McGowan backs the forklift

22   up.  Mr. McGowan testifies that Mr. Edwards gives him the

23   all okay signal, which we contest and said that he was in

24   the midst of blocking it.  And so I asked Mr. McGowan, what

25   signal did he give you?  I can't remember.

29

1          But the fact remains is our evidence is going to be

2     that that sling, one of the slings was still on the

3     forklift, and the other one fell off, and that's what hit

4     him.

5          So the idea is, by him backing up unaware that it in

6     some way disturbed that pipe, whether it was set down or

7     not, it was still being suspended, it had to be.  And when

8     he pulled -- backed it up, that it caused a disruption and

9     essentially pulled it off, and the sling -- one sling fell

10    off, and there you have it.

11         And the factual differences between what happened

12    are severe.  I mean, if you throw in Mr. Midkiff's

13    testimony, the driver, he says there was two and three pipes

14    on the ground.  So none of these individuals have the same

15    story.

16         But I think that goes -- as it relates to

17    Mr. Rugemer's qualifications, we're not asking him to opine

18    as to -- give a factual basis of who did what.  We're asking

19    him to educate the jury on this industry practice of safety

20    when free rigging.  He doesn't have experience in free

21    rigging in this way, but he can say that you can free rig

22    with an approved attachment, and he can say why it is.  It's

23    a safety violation because what's there to stop one of these

24    slings from falling off the edge and falling, which is

25    exactly what happened here.

1          So as to the factual basis or cause, we're not

2     offering Mr. Rugemer for that.  It's a factual -- the

3     difference is in the factual testimony that the jury would

4     have to make their decision on.

5          And then I think finally is just to the knowledge

6     element.  I can assure you that Mr. Rugemer, it is his

7     opinion that they had -- that Cardinal had to know about

8     this.  We're certainly not going to qualify -- I don't think

9     that they had to know certainly meets any Daubert standard.

10    But what he can testify to is, based on his training and

11    experience in logistics, in dispatching, how these loads --

12    what the dispatcher is required to do, how these loads are

13    consolidated or called in to dispatch, that identifies loads

14    being combined, and that then they go on the move.

15         To say that this sheet, this tracking software

16    isn't -- that isn't the purpose of what was going on is

17    strange to me.  It's tracking software.  This company has to

18    know where this load is at all times.  That's why it

19    sends -- the drivers have to send updates.

20         So he will testify as to I have -- in my experience,

21    I have managed similar and worked with similar software.  It

22    requires a user to input this information on behalf of the

23    company.  The drivers call this in.  They log the

24    information.  They log the information about where the

25    drivers are.  They log the information about what product is

1    on that truck and where it's going and when.

2           And in this instance, we know that this product was

3    picked up -- it's undisputed, it was picked up several days

4    before it even moved and brought to the McElliotts yard.  So

5    the testimony there is -- with regard to Mr. Rugemer is that

6    certainly the Cardinal dispatcher knows that this is going

7    on.

8           Now I think their argument is that -- I honestly

9    don't think that they can dispute that, but their argument

10   goes to Christie Roberts, the dispatcher, is not upper

11   management so how -- she doesn't speak for our company.

12          And then you get into Mr. Riley's deposition

13   testimony on behalf of the corporation where he's all over

14   the place.  And I think this court -- would he need

15   approval?  No, he wouldn't need approval.  Is this a policy

16   of Cardinal that he couldn't do this type of stuff?  Yeah,

17   it's absolutely a policy he can't do this.  I mean, he's all

18   over the place.

19          So I think the challenge is based on the factual

20   discrepancies, and they're putting it on Mr. Rugemer is not

21   qualified, and that's not what we're offering him for.

22          THE COURT:  All right.  Thank you.

23          Do you want to --

24          MR. SCHMALZER:  Your Honor, may I address just one

25   or two things?

1          Again, Mr. Rugemer is going to be offered to testify

2     with regard to the use of approved attachments.  Again,

3     we're going back to OSHA.  So it's our position OSHA doesn't

4     establish standard of care here, that whether an attachment

5     is approved or not is irrelevant.  They can't go there.

6          Mr. Rugemer never explained or had any opinion with

7     regard to what would have changed about the outcome of this

8     had an approved attachment been used.  But, again,

9     Mr. Rugemer cannot say how the practice of free rigging

10    should or should not occur without necessarily relying on

11    OSHA's guidance, which does not establish the standard of

12    care in this particular case.

13         And I'll address the knowledge issue again.  I think

14    there needs to be a distinction drawn between what Cardinal

15    is contending it knew or could have known about and what it

16    is contending that it did not know or could not know about.

17         Cardinal doesn't contest that owner-operators may

18    consolidate loads, and that there is evidence in the record

19    that could tip them off to that.  What it does not do and

20    does not allow is for independent owner-operators to engage

21    in unsafe -- it doesn't want them engaging in unsafe

22    practices in doing this on their own when they shouldn't be

23    doing it.

24         So on one hand, it's common for load consolidation

25    to occur because often it's done by the customer.  What it

1    doesn't do is go and look for individual owner-operators

2    performing this task, and so there's a difference.

3         In this case, none of the evidence relied upon by

4    Mr. Rugemer, specifically the screenshot of the program he

5    had never used before being used by an employer he never

6    worked for before, shows or even hints at the means and

7    methods by which Danny McGowan or somebody he hired or some

8    third party may have been consolidating loads on a trailer.

9    That printout shows none of that.

10        All it shows is that loads are on the same trailer.

11   It doesn't tell us how they got there, who put them there,

12   when they were put there, where they were -- where they were

13   put there, if that makes sense.

14        So to the extent Mr. Rugemer wants to extrapolate

15   that into Cardinal had full knowledge and appreciation of

16   the fact that Danny McGowan was loading and unloading, you

17   know, steel rods at his yard using a free rig and forklift

18   apparatus, it's simply not true.

19        And, you know, Mr. Rugemer came into that whole

20   analysis with a significant amount of bias, in fact stating

21   during his deposition that I refuse to believe in any way

22   that Cardinal does not know what Mr. McGowan is doing based

23   upon the screenshot that shows none of the stuff I just told

24   you about.

25        So, again, Mr. Rugemer offering testimony on what

34

1    Cardinal may or may not have known is irrelevant.  It

2    doesn't rely upon any special industry experience.  He never

3    even used the program that is being relied upon to form his

4    opinion.  To the extent he's going to testify -- to the

5    extent he's going to testify with regard to what Cardinal

6    knew or should have known, he should not be allowed.

7              THE COURT:  All right.  Thank you.

8              We're set for trial next week, right?

9              MR. ROBERTSON:  Yes.

10             THE COURT:  So although I generally prefer not to

11   try to rule from the bench, with this caveat, I'll tell you

12   at least what I am inclined to conclude at this point, and

13   I'm saying this because we're so close to trial.

14             I'm inclined to find, first, OSHA does not apply.

15   It's clear that this is not a setting in which OSHA supplies

16   mandatory regulation concerning the practices of the use of

17   a forklift to load or unload a trailer.  So I'm at this

18   point leaning towards precluding the plaintiff's expert from

19   making any reference to OSHA.

20             However, I believe the plaintiff's expert does

21   provide an opinion based upon industry practice that doesn't

22   depend upon OSHA as the source of information to set that

23   standard of care.  So I believe he'll still be able to

24   testify and offer an opinion about the hazards of the

25   practice.

35

1          With respect to whether or not his opinion about

2     free rigging is relevant, that depends upon the evidence.

3     The plaintiff is going to have to adduce evidence from which

4     a jury can reasonably determine that free rigging played

5     some causation role in what happened here.  So that can't be

6     ruled upon until the fact witnesses have testified and

7     presumably then a sufficient hypothetical question is posed

8     to the expert.

9          With regard to the other issue that's been raised,

10    and that is the expert's testimony concerning the

11    significance of the dispatch record, I'm inclined to say

12    that I'll permit him to testify as to the industry practice

13    that he describes where -- I don't think it's contested --

14    loads are consolidated as a customary practice by people

15    providing transport in this type of setting.  He certainly

16    can describe that practice.

17         And to the extent to which this printout reflects

18    information or knowledge about that practice, I don't

19    believe he can testify directly as to the state of mind of

20    Cardinal or even the dispatch employee.  So I think his

21    testimony is going to have to be narrow and focused so that

22    it stays within the parameters I've just tried to describe.

23    And I'll try to elaborate perhaps more as I write something

24    up in the next couple of days to reflect my final ruling.

25         With that, I'll also remind you that this is a

1    preliminary ruling, and I reserve the right, once I've sat

2    down and talked this through and start writing it up, to

3    change it.

4          All right.  I know that Cardinal has provided its

5    proposed instructions.  Have the other parties done that

6    yet?  Okay.  I was out of town Friday, so I hadn't actually

7    looked at the docket sheet until this morning and did so

8    quickly.  I saw where they had filed theirs.

9          I know there's also been perhaps two motions in

10   limine filed?

11         MR. ROBERTSON:  Just one by us, Judge, and we

12   apologize for filing it late.  Mr. Weston was reviewing some

13   medical records that in this case are probably into the four

14   to 5,000 page range.

15         He was going through those, and he found -- if the

16   Court would like me to --

17         THE COURT:  Well, at this point do defendants know,

18   first, whether they will contest the plaintiff's motion to

19   exclude evidence of the plaintiff's past drug use?

20         MR. SCHMALZER:  Your Honor, I think we will be

21   contesting that.  If this instance that was identified

22   during medical record review was the only one, I don't think

23   we would.  But there are instances including this one prior,

24   immediately during, and then after.

25         THE COURT:  Well, I haven't even read the motion.

1          Do you believe --

2          MR. SCHMALZER:  We're going to be filing an

3     opposition motion, yes.

4          THE COURT:  Okay.  How soon do you think you could

5     file it?

6          MR. SCHMALZER:  Within the next day or so.

7          THE COURT:  Okay.  Good enough.

8          How about your client?

9          MR. BELLOMY:  We also intend to contest the motion,

10    Your Honor, and we'll have the response filed by the end of

11    this week.

12         THE COURT:  All right.  So do you think you can file

13    it by Thursday morning at some point?

14         MR. BELLOMY:  Certainly, Your Honor.

15         THE COURT:  All right.  So if the parties, the

16    defending parties will provide their response by noon

17    Thursday.  If there's going to be a reply, it's going to

18    have to be done very, very quickly obviously.  But I'll

19    leave it at that.

20         And then, as I see it, Cardinal has applied for

21    entry of default on its cross claim.  Have you seen that,

22    counsel?

23         MR. BELLOMY:  I have, Your Honor, and we filed a

24    motion to set aside the entry of default yesterday

25    afternoon.

38

1          THE COURT:  All right.

2          MR. SCHMALZER:  We intend to file a reply again

3    either by the end of the day or tomorrow.

4          THE COURT:  Okay.  Good enough.

5          All right.  Is there anything else we need to

6    address at this point?

7          MR. ROBERTSON:  Not from plaintiffs, Your Honor.

8          MR. SCHMALZER:  No, Your Honor.

9          MR. BELLOMY:  No, Your Honor.

10        (Off-the-record discussion with Courtroom Deputy.)

11         THE COURT:  My clerk advises me that you all maybe

12   have been in contact with our IT department.  If you

13   haven't, you better be if you intend to use any of the

14   computer or display technology that we have in the courtroom

15   to make sure that you know and understand how to use it

16   because we have to depend upon you folks, either as counsel

17   or if you have a technician that can come, to understand.

18   We don't supply that.  The rest of us are more or less

19   bystanders to whatever it takes to get this thing operating.

20         Have there been any settlement discussions?  Is

21   there anything in the offing, the possibility of settlement?

22         MR. ROBERTSON:  There's been discussions.  They're

23   not getting anywhere fast.

24         THE COURT:  All right.  Well, we have a final

25   settlement conference scheduled the day before trial.  In

39

1     keeping with my practice, I'll remind you that I do require

2     the parties to be able to come in and explain the status of

3     settlement and to have persons with full authority to settle

4     the case on all sides present for that final settlement

5     conference.  I'll gauge then whether further discussion is

6     appropriate, but we will expect that.

7          And then, in addition, if there are any other

8     logistical or other matters the Court can take up, be

9     prepared for that.  My plan would be to -- we usually get

10    the jurors in here before 9:00.  I'll require counsel to be

11    here at 8:30 on the day of trial, and we will hopefully be

12    picking a jury starting about 9:00.

13         All right.  Is there anything else?

14         MR. ROBERTSON:  Judge, just on the issue of full

15    settlement authority and just speaking on behalf of the

16    plaintiffs, we're not really clear who that is in this case.

17    In our settlement discussions, there is multiple insurance

18    providers who have issued coverage, denied coverage,

19    contingent coverage.

20         There is also Cardinal as a business that I think

21    may have a stake in the game outside of insurance.  I can't

22    speak for them.  That's my take on it.  I think Mr. Bellomy

23    might have a take on it, that the McElliotts defendants have

24    demanded coverage from Cardinal as a corporation from all of

25    the insurance providers.

40

1          So if settlement discussions are going to get

2     anywhere at the settlement conference, I think there needs

3     to be maybe clarification as to who has full authority to

4     settle it.  I can't say -- after all the litigation we've

5     done, I can't say that I have any idea.  I just think that

6     might be an issue.

7          THE COURT:  All right.  Mr. Schmalzer, let's hear

8     from you about that first.

9          MR. SCHMALZER:  Your Honor, we will be attending

10    with a representative of Cardinal as well as a

11    representative of James River Insurance, who is providing

12    them coverage in this case.

13         THE COURT:  How much coverage is there from your

14    insurer?

15         MR. SCHMALZER:  I believe one million.

16         THE COURT:  All right.

17         MR. SCHMALZER:  There are two other carriers

18    tangentially involved, I believe Canal Insurance and Great

19    American Insurance.  I believe a representative of Canal

20    attended the mediation, but did not participate.  And as far

21    as Great American goes, I believe that that is McElliotts'

22    non-trucking carrier, and I don't know that they have

23    participated at all in any of the negotiations.

24         THE COURT:  What's the connection with the other

25    insurer that you identified?

1          MR. SCHMALZER:  I think they're the auto carrier,

2     and James River is the CGL carrier.

3          MR. BELLOMY:  Your Honor, Great American denied

4     coverage early on in this litigation.  And by all sources

5     who have looked at that denial, it appears that -- it

6     appears at this point that it was proper.  So I don't feel

7     that Great American's involvement would be helpful.

8          However, we have made demands for coverage on behalf

9     of the McElliotts defendants to Canal Insurance and to James

10     River.  Canal has made a -- they have issued a denial for

11     coverage.  James River has not responded in any manner to

12     our -- to our demand.

13          There are arguments for coverage of the McElliotts

14     defendants under those policies, and I do think it would be

15     productive to have representatives of Canal and James River

16     involved in the final settlement.

17          THE COURT:  Well, you said James River is who you

18     will have here?

19          MR. SCHMALZER:  Yes.

20          THE COURT:  Honestly I think that's probably as much

21     as I would expect at this point.  So you'll have a

22     representative of that insurer and your company?

23          MR. SCHMALZER:  Correct.

24          THE COURT:  All right.  Is there anything else that

25     we can take up this morning?

42

1          MR. ROBERTSON:  Not from plaintiffs, Your Honor.

2          MR. SCHMALZER:  Not that I'm aware of, Your Honor.

3          MR. BELLOMY:  No, Your Honor.

4          THE COURT:  If not, we stand in recess.  Thank you

5   all.

6          THE COURT SECURITY OFFICER:  All rise.  This

7   honorable court is in recess.

8              (Proceedings were concluded at 10:33 a.m.)

9                        ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATION:

2         I, Kathy L. Swinhart, CSR, certify that the foregoing

3    is a correct transcript from the record of proceedings in the

4    above-entitled matter as reported on October 10, 2017.

5

6

7    March 15, 2018
     DATE

8

9    /s/ Kathy L. Swinhart
     KATHY L. SWINHART, CSR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25